RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0256P (6th Cir.)
File Name: 00a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SAMMYE R. HOLLOWAY,
　　　*Plaintiff-Appellant,*

　　*v.*

No. 96-3732

SALLY BRUSH; CLERMONT
COUNTY, OHIO,
　　　*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 94-00214—Jack Sherman, Magistrate Judge.

Argued: December 8, 1999

Decided and Filed: July 31, 2000

Before: MARTIN, Chief Judge; MERRITT, NELSON,
RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER,
BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Donna S. Rose, ROSE LAW FIRM, Ft. Thomas, Kentucky, for Appellant.  Helen E. Mason, CLERMONT COUNTY PROSECUTING ATTORNEY, CIVIL DIVISION, Batavia, Ohio, for Appellees.  **ON BRIEF:** Donna S. Rose, ROSE LAW FIRM, Ft. Thomas, Kentucky, for Appellant. Helen E. Mason, CLERMONT COUNTY PROSECUTING ATTORNEY, CIVIL DIVISION, Batavia, Ohio, John T. Williams, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees.

    BOGGS, J., delivered the opinion of the court, in which MARTIN, C. J., MERRITT, NELSON, RYAN, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, and GILMAN, JJ., joined.  CLAY, J. (pp. 23-69), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

    BOGGS, Circuit Judge.   The district court awarded summary judgment to all defendants in Sammye Holloway's § 1983 suit for damages, brought after an order of the Clermont County Court of Common Pleas Juvenile Division terminated her parental rights and granted permanent custody of her children to the Clermont County Department of Human Services ("CCDHS").  Holloway appealed the district court's ruling as to two of the defendants, Sally Brush and Clermont County.  A three-judge panel of this court held that both these defendants enjoy absolute immunity from suit for actions taken in a judicial context.  *See Holloway v. Ohio*, 179 F.3d 431 (6th Cir. 1999).  The full court then granted a rehearing *en banc* to decide the question of the extent to which a public child services agency caseworker, in this case Sally Brush, may be entitled to immunity for her acts in connection with a child custody proceeding.  *See Holloway v. Ohio*, 197 F.3d

236 (6th Cir. 1999). For the reasons that follow, we reverse the district court's ruling that Sally Brush enjoys absolute immunity for her conduct in this case, and its grant of summary judgment in her favor on that basis. The district court's grant of summary judgment to Clermont County, however, is affirmed.

## I

Sammye Holloway, a mother who despite a high-school diploma reads and writes at a third-grade level due to dyslexia, lost track of her two children, then six months and two years old, when, as alleged in her complaint, her husband threw her out of their Oklahoma home in November 1988 and absconded with the children to another state. Over several years, she made numerous attempts to locate them through the relevant agencies of many states. She had no success until, in 1992, her letter to authorities in the State of Washington led them to notify Ohio, resulting ultimately in contact between Holloway and the CCDHS in the person of Sally Brush, a caseworker there. The sequence of events appears to be as follows.

In 1990, after an odyssey through several states, a sequence of failed jobs and the three of them living out of vehicles, the father and the children were stranded in Clermont County, Ohio after his car broke down there. In November, Ohio authorities became aware that the children were living in a car, in extremely unsanitary conditions. Proceedings were instituted to deprive the father of custody on grounds of abuse and to award custody to CCDHS, preparatory to having the children adopted. CCDHS was granted temporary custody of the Holloway children on November 29, 1990. Efforts to notify Holloway by mail were fruitless, so Clermont County attempted to notify her of the proceedings by publication in the spring of 1991. CCDHS also attempted to place the children with a paternal relative in Spokane, Washington, but this was unsuccessful and the children were returned to Ohio in May or June of 1992. Brush began administering the children's case plan on March 1, 1992. In November 1992,

Brush provided an affidavit that Sammye Holloway's whereabouts were unknown, permitting her to be served with notice by publication in The Clermont Sun. On December 15, 1992, Brush testified before a referee appointed by the Clermont County Juvenile Court that the children's father should not regain custody and recommended that permanent custody be awarded to CCDHS. The referee agreed, embodying his recommendations in a report filed on January 26, 1993. *See* Twelfth Appellate District Court of Appeals, Original Action in Habeas Corpus, Case No. CA96-06-052, Stipulated Statement of Evidence, at ¶ 20 (October 11, 1996). Ohio law provides that such a referee's recommendations are to be reviewed, and may be adopted, modified, or set aside by the juvenile court, which also "may hear additional testimony . . . ." Ohio Rev. Code Ann. § 2151.16 (Baldwin 1994). Brush continued to follow the process throughout 1993, in coordination with Clermont County Assistant Prosecutor Thomas Flessa.

On May 12, 1993, the Washington Department of Social and Health Services wrote to CCDHS, addressing the letter to both Melissa O'Farrell, Supervisor, and Sally Brush, Social Worker, attaching the letter Washington had received from Holloway requesting information about her children. A copy of the letter was sent to Holloway. Brush received that letter on May 18th, and called Flessa about it that day. Her notes on this call read: "5-18-93  Telephone call to Tom Flessa, told him about letter. Legally we have custody." Supplemental Brief of Appellees (En Banc Rehearing) at 27 (Appendix C: Holloway/Dictation). On May 20, 1993, Brush received a letter from Holloway requesting that she put the children on a plane to Kansas City, where Holloway proposed to pick them up. The following day Brush and Holloway spoke by telephone.

At that time, CCDHS had temporary custody of the children, while the juvenile court was considering the referee's recommendation regarding permanent custody for CCDHS. But that is not what Brush told Holloway. For reasons that have not been satisfactorily explained, in their

it is clear that like the Kansas District Court, the district court below as well as this Court on appeal do not have jurisdiction to hear the matter. Dismissing the case on jurisdictional grounds would not only be legally sound, it would not leave Plaintiff in any worse position. However, failing to dismiss the case and sending the matter back for trial may have the affect of putting children in a worse position by detrimentally, and unjustifiably under these facts, affecting the people who champion their rights and care for them. The answer as to whether the district court's order dismissing Plaintiff's case should be affirmed could not be more clear; we should affirm, albeit on different grounds. I am not without compassion for Plaintiff.[14] However, neither the district court nor this Court is the proper forum for the relief which she actually seeks. Plaintiff's case belonged in the hands of the Ohio courts and ultimately in the hands of the United States Supreme Court. I therefore respectfully dissent.

---

[14]The majority makes the unfounded assertion that I am hostile toward Plaintiff and that I "repeatedly opin[e] that finality in this case is in the children's best interest . . . ." Simply because I choose not to ignore the law of the case, subject matter jurisdiction, and a variety of procedural problems associated with Plaintiff's appeal for which other litigants have been held accountable, does not equate with hostility. However, one may say that the majority is hostile toward Ms. Brush when it repeatedly and inappropriately makes credibility determinations about Ms. Brush before remanding the case for trial – i.e., Ms. Brush "lied," "refused to discuss the case," and "hid" Plaintiff. These are matters for the jury and have no place in the majority opinion. Moreover, it was the Ohio Supreme Court, not I, which opined that it was not in the children's best interests to be returned to Plaintiff. When the majority calls for Plaintiff to have the proper hearings in the Ohio courts, it implicitly undermines the Ohio Supreme Court's refusal to grant Plaintiff a writ of habeas corpus each time that she sought such relief from that court. Obviously, Plaintiff is not seeking a custody hearing in the Ohio courts as an exercise in due process futility. Plaintiff wants the custody hearing because Plaintiff wants the return of her children. And, again, the Ohio Court of Appeals and the Ohio Supreme Court have expressly denied her such relief, finding that it was not in the children's best interests. Unlike the majority, I make no assertion, implicitly or otherwise, as to whether the Ohio courts were correct in so holding; rather, I direct Plaintiff to the United States Supreme Court, where she should have proceeded long ago.

In short, "immunity helps social workers put their private interests aside and concentrate on the welfare of children. Unfortunately, immunity also may embolden social workers to pursue their private agendas . . . . One effect is inseparable from the other." *Millspaugh*, 937 F.2d at 1177. However, it is for the greater good that child social workers proceed in their quasi-judicial capacities without fear of redress from parents who, perhaps sometimes through no fault of their own, simply cannot properly care for their children. As espoused by Judge Learned Hand when commenting on the absolute immunity afforded to police officer witnesses who knowingly provide false testimony against defendants whose liberty is at stake:

"As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than subject those who try to do their duty to the constant dread of retaliation."

*Briscoe v. LaHue*, 460 U.S. 325, 345 (1983) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

Here, in the end, it is far better to leave unredressed the alleged wrongs of Ms. Brush than to subject her to litigation under the circumstances of this case. Allowing the case against Ms. Brush to proceed, thereby subjecting her to potential liability, may provide Plaintiff with money damages to cover expenses for a short period of time; however, it will also send a message to child social workers causing them to second-guess their actions in a way which could forever affect the lives of children who are victims of neglect and abuse.

## IV. CONCLUSION

It is well established that federal courts have a duty to examine the issue of subject matter jurisdiction "throughout the pendency of *every* matter before them" *see Children's Healthcare is a Legal Duty, Inc.*, 92 F.3d at 1419 n.2, and this Court should therefore fulfill its duty in this case. In doing so,

telephone conversation on May 21, 1993 Brush falsely informed Holloway that CCDHS had already been awarded permanent custody of her children. Brush concedes this, but characterizes it as a "misstatement." Supplemental Brief of Appellees (En Banc Rehearing) at 15. Brush's own notes of that conversation, however, indicate she did not merely misspeak: "I told Mrs. Holloway her best bet is to talk to a lawyer about her rights. At this point, our agency has permanent custody." *Id*. at 27 (Appendix C: Holloway/Dictation). Moreover, Holloway claims that Brush told her "they had taken away her parental rights whether she likes it or not," and refused to discuss the matter further, advising Holloway to get a lawyer. Brief for Appellant at 6. Brush repeated the latter advice in a letter to Holloway dated June 2, 1993. Although the matter of awarding permanent custody to CCDHS was still pending before the juvenile court, the long-sought appearance of the children's mother, who had not been heard at the December proceeding, was not brought to the court's attention by Brush, nor by assistant prosecutor Flessa, who knew as early as May 18th that Holloway had surfaced. Indeed, Holloway alleges that when, on May 24, 1993 Brush failed to keep an appointment to speak with Holloway by phone, due (as Brush's June 2nd letter states) to the fact that Brush was out of her office that afternoon, Brush was actually in court to file a document related to the Holloway custody case. Brief for Appellant at 6. The record indicates that a Case Plan Document Amendment was in fact filed on that date. *See* Twelfth Appellate District Court of Appeals, Original Action in Habeas Corpus, Case No. CA96-06-052, Stipulated Statement of Evidence, at ¶ 24 (October 11, 1996).

Brush's telephone log of this period continues with entries relating to the children's medical coverage, placement in school as foster children, and other details. On June 15th, the day *before* the court acted on permanent custody, there is the following entry: "6-15-93 Telephone call to [assistant prosecutor] Tom Flessa. He is writing the letter to Sammye Holloway. I should not worry needlessly at this point about her *disrupting the whole process*. We did everything legally

as to publication/notice" (emphasis added). Supplemental Brief of Appellees (En Banc Rehearing) at 28 (Appendix C: Holloway/Dictation).

On June 16, 1993, the court accepted the referee's report by written order, awarding permanent custody of the children to CCDHS. (The father, Albert Holloway, appealed the juvenile court's award of permanent custody to CCDHS; this was affirmed. *See In the Matter of T.J. Holloway, John Holloway*, 1994 WL 18161, *1 (Oh. App. 12 Dist., Jan. 24, 1994) (unpublished).) On June 18, 1993, two days after the juvenile court acted, Flessa wrote Sammye Holloway to inform her that CCDHS had permanent custody of her sons, and continued "I suggest that you contact an attorney in regard to your legal rights, as our plan is to seek adoptive homes for the children."

Sammye Holloway moved to have the order of permanent custody set aside by the juvenile court; the motion was denied and Holloway appealed. The Ohio Court of Appeals ruled that Clermont County had not followed proper procedures to give her notice, and remanded the case for a new hearing. *See In re Holloway*, No. CA95-09-064, 1996 WL 227481 (Ohio App. 12 Dist., May 6, 1996) (unpublished). But no rehearing was held, and Holloway sought habeas corpus relief. Ultimately, the Ohio Supreme Court denied Holloway's habeas petition, in part at least because the Ohio Court of Appeals had previously remanded the case to Clermont County for renewed proceedings with Holloway present. In its ruling the Ohio Supreme Court specifically relied on and reiterated assurances that Holloway's rights would be protected by renewed custody proceedings. *See Holloway v. Clermont County Dep't of Human Servs.*, 80 Ohio St. 3d 128, 131, 684 N.E.2d 1217, 1220 (Ohio 1997). Nevertheless, to this day, seven years after CCDHS secured permanent custody of the Holloway children without their mother being heard, no rehearing has taken place and Holloway's sons remain in the care of the foster parents who adopted them.

unconstitutional behavior by child social workers, in the same way that alternative means are available to the public from such conduct by prosecutors and judges. *See Imbler v. Pachtman*, 424 U.S. 409, 428-29 (1976). For example, appellate review is available. *See id.; see also Butz v. Economou*, 438 U.S. 478, 512 (1985); *Ernst,* 108 F.3d at 497; *Millspaugh*, 937 F.2d at 1175-77. In addition, the agency which employs social workers have an incentive to insure that its employees do not violate the Constitution, because the agencies are not immune from liability for abuses committed by employees with policy-making authority. *See Ernst*, 108 F.3d at 497. And, of course, social workers, like prosecutors and judges, are subject to criminal prosecution under 18 U.S.C. § 242 for willful deprivations of constitutional rights, even if absolutely immune from civil liability. *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983).

Second, child social workers are better able to perform their jobs -- and therefore ostensibly protect our children -- if their judgment is not compromised by the threat of personal liability under § 1983 from a disgruntled parent. As recognized by the Supreme Court, "if litigation expenses mount, social workers . . . may well become less willing to seek placements for children over their parents' objections, whether rational or irrational, even though in their honest judgment the child's best interests demand it." *Lehman*, 458 U.S. at 514 n.18. Indeed, "[s]ocial workers often act on limited information; those who tarry, or resolve all doubts in favor of the parents, chance enduring damage to the children." *Millspaugh*, 937 F.2d at 1176-77 (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). Likewise, defending against such suits would divert the social worker's time and attention away from her official duties, in which case innocent children are the parties who suffer the consequences. *See Imbler*, 424 U.S. at 424-25. Imposing liability and requiring social workers to defend such suits would impose "intolerable burdens" upon the caseworker who is likely working under serious time constraints and carrying a heavy case load. *See id.*

immediately presenting herself to the court is entitled to absolute immunity. *See id.* at 497-98; *see also Millspaugh v. County Dep't of Pub. Welfare,* 937 F.2d 1172, 1176 (7th Cir. 1991).

Characterizing Ms. Brush's actions as usurpations of the court's authority, the majority contends that *Ernst* does not apply because all of Ms. Brush's actions denied the court the opportunity to evaluate any recommendations. In other words, the majority claims that *Ernst* extends only to recommendations that a social worker makes to the court, and not to the judgment exercised by the social worker leading up to deciding what to recommend and whether to recommend anything at all. However, as stated above, *Ernst* expressly held that a social worker is entitled to absolute immunity for the formulation of judgments "to determine *whether* and in what manner to seek judicial action," and that denying absolute immunity for the actions which led to recommendations – whether or not the result of the exercise of professional judgment led to a recommendation to the court at all – would "eviscerate" the absolute immunity afforded to them. *See* 108 F.3d at 497 (citing *Buckley*, 509 U.S. at 272-73).

Finding that Ms. Brush is entitled to absolute immunity for her actions -- or perhaps more accurately stated, for her inactions -- of which Plaintiff complains, comports with strong policy reasons based upon the welfare of our children and the body of those individuals who have made it their chosen profession to act in best interests of children. In stating these policy reasons and in finding Ms. Brush absolutely immune, in no way do I wish to suggest that a parent's custody right to his or her children is not strong. However, what we must keep in mind is that parental rights are not absolute and that they bow to what is in the children's best interests. The policy reasons for affording Ms. Brush immunity are two-fold.

First, parents have available to them other means than suits filed under § 1983 in order to protect against alleged

In March 1994, Holloway sued the State of Ohio, the Ohio Department of Human Services, Clermont County, and Sally Brush for monetary damages in federal district court in Ohio under 42 U.S.C. § 1983. The suit against the first two plaintiffs was dismissed as barred by the Eleventh Amendment's guarantee of a state's sovereign immunity from suit in federal court. Holloway now appeals the district court's grant of summary judgment, on grounds of absolute immunity, to defendants Clermont County and Sally Brush.

## II

This court reviews a district court's grant of summary judgment de novo. *See, e.g., Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997). Summary judgment is called for "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court will view the facts, and all inferences to be drawn from them, in the light most favorable to the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party, in answering a motion for summary judgment that is supported properly, must show that there is, indeed, a genuine issue for trial. *See Fox v. Van Oosterum*, 176 F.3d 342, 347 (6th Cir. 1999). Such an issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A

The district court concluded that Clermont County was absolutely immune from suit because it acted as an integral part of the judicial system in the matter of the custody of the Holloway children. However, counties and other local governments – while "persons" for the purposes of § 1983 liability in the sense that they can be sued – do not enjoy the defenses of absolute and qualified immunity that are available

to human defendants sued in their individual capacities. *See Owen v. City of Independence*, 445 U.S. 622, 650 (1980); *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 694 (1978); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). That is to say, the liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a "policy" or "custom" attributable to the county or local government Nevertheless, the district court reached the correct result in awarding summary judgment to Clermont County, as we shall explain below. Therefore we shall affirm its judgment, although on other grounds. *See Andrews v. Ohio*, 104 F.3d 803, 808 (6th Cir. 1997) (holding this court may affirm on any grounds supported by the record, even if different from the district court's grounds).

Clermont County could only be held liable if its "official policy," not the acts of its executives or agents, were the source of Holloway's injury, as the Supreme Court has made clear:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694. Thus, "a municipality cannot be made liable by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986). The acts in question must be "acts which the municipality has officially sanctioned or ordered." *Id*. at 480. Under appropriate circumstances, even a single act or decision may qualify as an official government policy, though it be unprecedented and unrepeated. *See ibid.* But in any case, acts will only be construed as official policy when they are those of a body or an official "responsible for establishing

For example, Ms. Brush's actions may be analogized to a prosecutor who would be protected by absolute immunity for initiation of a case against a defendant. Indeed, the majority claims that Ms. Brush should have done exactly that — initiated proceedings when Plaintiff surfaced. It follows that since Ms. Brush would have been entitled to absolute immunity had she initiated proceedings against Plaintiff and incorporated her into a case plan, Ms. Brush should be entitled to absolute immunity for her *failure* to do so. *See Buckley,* 509 U.S. at 272-73; *Ernst v. Child and Youth Servs.,* 108 F.3d 486, 495 (3d Cir. 1997) (holding that child social workers "are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency hearings" as well as "the formulation and presentation of recommendations to the court in the course of such proceedings").

Likewise, any actions taken by Ms. Brush in the preparation, evaluation, and formulation of recommendations which may or may not have eventually been made to the court, are entitled to absolute immunity. *See Ernst,* 108 F.3d at 497-98. As the Court of Appeals for the Third Circuit held in *Ernst*, "[t]o grant [child social workers] absolute immunity for the recommendations that they made to the court but deny them such immunity for the observations and judgments that were the necessary predicate for those recommendations would eviscerate the immunity they did receive and undermine the purposes sought to be advanced by the grant of absolute immunity." *Id.* at 498. Therefore, it follows that Ms. Brush is absolutely immune for her actions in evaluating information concerning Plaintiff making contact, even if that evaluation and judgment did *not* lead to a recommendation to the court. *Id.* at 498 (noting that "the [Supreme] Court has expressly embraced the idea that immunity must be afforded to the evaluation of available data to determine *whether* and in what manner to seek judicial action") (emphasis added) (citing *Buckley*, 509 U.S. at 272-73). In a similar vein, any professional judgment that Ms. Brush may have exercised, correctly or incorrectly, regarding the status of the ongoing judicial proceeding which may have prevented Plaintiff from

parent.[12] *See* Ohio Rev. Code Ann. § 2151.414(C) (Anderson 1998). Indeed, the theory behind affording social workers immunity is to allow them to proceed on behalf of the children's best interests without fear of reprisal from disgruntled parents. Therefore, by the very nature of the work they perform, child social workers are not seen by parents as individuals acting on their behalf; rather, they are viewed as parental adversaries, whether in the course of developing a case plan or performing some other task, where their efforts may ultimately lead to a termination of parental rights.[13]

Focusing on the relevant acts for which Plaintiff complains, failing to notify the trial court that Plaintiff had made contact and wished to assert her parental rights; telling Plaintiff that her rights had been severed when they had not yet been; and withholding information that would have enabled Plaintiff to raise her rights in court before they had been terminated, I believe that all of these acts were intimately associated with the judicial process such that Ms. Brush was functioning as an advocate at the time and should therefore be entitled to absolute immunity. Because this case presents a unique set of facts in that Plaintiff was not a party to the custody matter, it does not fit squarely within any cases presented thus far. Moreover, the case is unique because Plaintiff is seeking to hold Ms. Brush liable for acts that she did not perform, as opposed to affirmative acts performed, as is usually the case. However, by analogy and negative implication, Ms. Brush's actions would be protected by absolute immunity.

---

[12] The same may be likened to United States Attorneys, for example, who are part of the Department of Justice whose interests lie in seeing that "justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

[13] The adversarial nature of relations between parents and social workers is not unknown in the social work profession. In fact, a bill is pending in Michigan at the current time which seeks to protect, as well as to compensate, social workers who are injured as a result of assaults by parents who are under investigation. *See* H.R. 4267, 90th Leg., Reg. Sess. (Mich. 1999).

final government policy respecting such activity . . . ." *Id.* at 483.

Holloway has not even alleged, much less adduced evidence to support, a claim that it was Clermont County's official policy to dispose of child custody issues without hearing each of the child's parents, a claim that would be most unusual since such an official policy, in addition to its being blatantly unconstitutional, *see Lassiter v. Dep't of Social Serv. of Durham City*, 452 U.S. 18, 27 (1981), would never be tolerated by any conceivable majority. Furthermore, neither Brush nor Flessa were final decisionmakers in Clermont County, and the record neither names nor implicates other individuals nor any county council or decisionmaking body.

For these reasons, the decision of the district court to grant summary judgment to Clermont County was correct and is affirmed.

**B**

In the Brief for Appellant originally filed by Holloway with this court, the district court's ruling that Brush and Clermont County were immune from suit as actors in a judicial process was challenged based on the argument that the Clermont County courts lacked jurisdiction over Holloway and hence could not be entitled to immunity. This argument is clearly mistaken; it confuses personal jurisdiction, arguably lacking in this case, with subject matter jurisdiction, which the Clermont County Court of Common Pleas, Juvenile Division, indisputably had. Only in the absence of subject matter jurisdiction are judicial actors devoid of the shield of immunity. *See Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1872)). When, however, a court with subject matter jurisdiction acts where personal jurisdiction is lacking, judicial and prosecutorial absolute immunity remain intact. *See id.* at 355-56.

The district court ruling leaves unresolved, however, whether Brush, as a social worker, could claim prosecutorial immunity for her particular actions in this case. Her immunity was not addressed by Holloway apart from the preceding, and unavailing, contention regarding jurisdiction. Rather, Holloway attacked for the first time in her reply brief Brush's claim that she had immunity because she was involved in prosecution. The question thus arises as to whether that issue has been waived and is not reviewable on appeal. *See United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997) (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993)) (holding that issues raised for the first time in a reply brief are not reviewable).

The doctrine of *Washington* and *Perkins* is intended to ensure that the opposing party has had a full and fair opportunity to consider and respond to the issue in question. In the instant case, the issue was first argued to this court by Brush, not Holloway. The Brief for Appellee, at 15-17, arguing in the alternative, defends the district court's ruling on this very ground, citing and analyzing cases that Holloway's Reply Brief for Appellant, at 11-18, subsequently addressed. Thus, this is not the situation that *Washington* and *Perkins* enjoin, in which a matter is raised for the first time in the reply brief, leaving the other party at a loss to respond. Holloway's initial brief, challenging the district court's ruling of absolute immunity, obviously gave Brush notice that her absolute immunity was contested. This properly put before this court the issue of her absolute immunity. Brush responded with a reason for absolute immunity: her prosecutorial role. Moreover, in Holloway's supplemental brief, filed for this rehearing *en banc*, the entire issue of Brush's entitlement to absolute immunity is once again thoroughly discussed. Brush thus had another opportunity to address in full the issue of her immunity and Holloway's arguments to the contrary. The issue is, therefore, properly before this court.

In other words, the majority claims that Ms. Brush was not functioning as an advocate for the state regarding the actions for which Plaintiff complains, because the actions somehow come down to a violation of Ms. Brush's duty under § 2151.412 and § 2151.416 to make Plaintiff part of the case plan, where Ms. Brush was standing in the shoes of the CCDHS which was a party to the case. Simply put, the majority contends that because Ms. Brush was standing in the shoes of a party in failing to incorporate Plaintiff into the plan, she could not be considered an advocate for the state; rather, Ms. Brush should have been some sort of advocate for Plaintiff. I disagree with what I believe to be the majority's flawed logic.

To begin, Plaintiff did not allege that Ms. Brush violated her duty to Plaintiff by failing to make her part of the case plan under the statute. Whether Ms. Brush had such a statutory duty to Plaintiff, and whether Ms. Brush violated that duty if she in fact had one, is not relevant to the matter at hand. Instead, we look to Ms. Brush's actions for which Plaintiff complains, and whether those actions can be considered prosecutorial, judicial, or otherwise intimately related to the judicial process, whether inside or outside of the courtroom, such that Plaintiff was acting as an advocate for the state at the time. We do not look to the actor involved, nor the statute under which she may have been acting in determining the level of immunity to be afforded. *See Buckley,* 509 U.S. at 269. Rather, we look to the *nature* of the function performed. *Id.*

However, even when considering the statute cited by the majority and Ms. Brush's duty to include Plaintiff in the case plan, I disagree with the majority's contention that Ms. Brush was not acting in an adversarial role toward Plaintiff or as an advocate for the state. As a child social worker for the State of Ohio, Ms. Brush is not an advocate for parents or legal custodians. Rather, her advocacy efforts lie in assisting the state to secure whatever is in the best interests of the children, which the state expressly says supersedes the interests of the

*Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (extending the absolute immunity afforded to prosecutors to those individuals who perform *analogous functions* such as employees of state department of social services). The analogy goes as follows: a prosecutor functions as an advocate for the state in bringing a defendant to trial for his alleged acts against a crime victim; a social worker functions as an advocate for the state in bringing parents or legal custodians of children to "trial" for their alleged actions, or perhaps inactions, against children who are victims or abuse or neglect. Of course, in the first instance, the criminal culpability is always invoked; while in the latter instance, a parent may not be criminally culpable in the traditional sense. Although a parent may be well-intended, he or she simply may not have the capacity, be it mental or physical, to provide the proper level of care for his or her children such that it may be necessary for the state, via its social services department, to intervene and ultimately terminate parental rights. In fact, under the Ohio probate code, "a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child," where the state's primary concern is the "best interests of the children." *See* Ohio Rev. Code Ann. § 2151.414(C) (Anderson 1998).

Turning to the matter at hand, the majority bases its holding that Ms. Brush is not entitled to absolute immunity for her actions of which Plaintiff complains on the ground that the CCDHS had a statutory duty to attempt to incorporate Plaintiff into the case plan pursuant to § 2151.412. The majority finds this significant for two reasons. First, by virtue of this statutory duty, the CCDHS was one of the parties; and second, the CCDHS was a party with a duty to attempt to obtain the agreement of other parties, including the parents, and it did so through Ms. Brush. The majority then concludes that Ms. Brush violated this statutory duty when she failed to incorporate Plaintiff into the plan when Plaintiff made contact. Based upon this conclusion, the majority contends that Ms. Brush improperly described herself to Plaintiff as her "adversary" and arrogated herself to an adversarial and quasi-prosecutorial role which Ohio law did not intend her to have.

### III

Judges and other court officers are absolutely immune from suit on claims arising out of their performance of judicial or quasi-judicial functions, *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967); *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994), but not from suits that arise out of other conduct, *Forrester v. White*, 484 U.S. 219 228 (1988); *Clinton v. Jones*, 520 U.S. 681, 694-95 (1997). Absolute immunity is determined by a functional analysis that looks to "'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). The official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing. *See Burns*, 500 U.S. at 486.

This court has held that under certain circumstances, social workers are entitled to absolute immunity. *See Kurzawa v. Miller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (holding that social workers are entitled to absolute immunity when prosecuting child delinquency petitions); *Salyer v. Patrick*, 874 F.2d 374, 377-78 (6th Cir. 1989) (recognizing the functional orientation of the absolute immunity doctrine and holding that social workers are entitled to absolute immunity when filing child abuse petitions); *but see Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989) (holding that social workers are not entitled to absolute immunity when deciding whether to open or continue an investigation, or when deciding to enter a parent's name in a central register of abusers, all of which are administrative or investigative by nature rather than prosecutorial). In all three of these cases, this court has explicitly analogized the social workers to prosecutors for purposes of the functional analysis. Thus, to determine the scope of the immunity extended to social workers, we look to the scope of prosecutorial immunity.

Absolute prosecutorial immunity is justified "only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing

conduct." *Burns*, 500 U.S. at 494. "Prosecutors are entitled to absolute immunity for conduct 'intimately associated with the judicial phase of the criminal process.'" *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Prosecutors are not absolutely immune when they perform administrative, investigative, or other functions; for example, when they give legal advice to the police, hold a press conference, or fabricate evidence. *Ibid.* "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity represents the norm . . . . *The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates'*" when they performed the actions complained of. *Buckley*, 509 U.S. at 273-74 (emphasis added). The Supreme Court has extended absolute immunity to prosecutors only where their challenged acts were performed while serving as an advocate in legal proceedings. *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997).

This Circuit has followed the Supreme Court closely. Prosecutorial immunity extends to "'a prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer.'" *Manetta v. Macomb County Enforcement Team*, 141 F.3d 270, 274 (6th Cir. 1998) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1446 (6th Cir.), *cert. denied*, 522 U.S. 996, 118 S. Ct. 560 (1997)). Prosecutors are not absolutely immune, however, when they perform administrative, investigative, or other functions. *Manetta*, 141 F.3d at 274 (denying absolute immunity to a prosecutor for investigating a couple and holding them on extortion charges without probable cause). "Sixth Circuit precedent has established that 'the critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process.'" *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993) (emphasis added) (quoting *Joseph v. Patterson*, 795 F.2d 549, 554 (6th Cir. 1986), *cert. denied*, 481 U.S. 1023 (1987)).

*Buckley* regarding absolute immunity afforded to prosecutors, and was expressly rejected by the Supreme Court:

Petitioner argues that *Imbler's* protection for a prosecutor's conduct in initiating a prosecution and in presenting the State's case, extends only to the act of initiation itself and to conduct occurring in the courtroom. *This extreme position is plainly foreclosed by our opinion in Imbler [v. Pachtman, 424 U.S. 409 (1996)] itself. We expressly stated that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom, and are nonetheless entitled to absolute immunity.* We noted in particular that an out-of-court effort to control the presentation of [a] witness' testimony was entitled to absolute immunity because it was fairly within [the prosecutor's] function as an advocate. To be sure, *Burns* made explicit the point we had reserved in *Imbler*: A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity. *We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.*

*Buckley*, 509 U.S. at 272-73 (internal quotation marks and citations omitted; emphasis added).

Furthermore, in her role as social worker with the Clermont County Department of Social Services, Ms. Brush was an advocate for the state regarding child custody issues, especially for purposes of determining immunity. *See*

underlying case, are limited to these three actions which have been liberally construed from the complaint.

The relevant inquiry into the level of immunity afforded to Ms. Brush for the three alleged actions is whether those actions can be considered "prosecutorial, judicial, or otherwise intimately related to the judicial process." *See Achterof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989). If they can be so considered, then Ms. Brush is entitled to absolute immunity. *Id.* If the actions are considered "investigatory or administrative" in nature, then Ms. Brush would only be entitled to qualified immunity. *See id.* In deciding whether the acts were prosecutorial or administrative/investigatory in nature so as to impose the proper level of immunity, a reviewing court employs the "functional approach" announced by the Supreme Court; which is to say, a court looks to "['']the nature of the function performed, not the identity of the actor who performed it.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).

Because social workers are analogized to prosecutors for immunity purposes, and because I acknowledge that in determining whether a prosecutor is entitled to absolute immunity we look to how closely related the challenged activity is to the prosecutor's role as an advocate, *see Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993), I agree that for purposes of determining whether a social worker is entitled to absolute immunity for an alleged action, we look to whether she was functioning as an advocate for the state at the time. However, I disagree with the majority's myopic view of those instances when a social worker is functioning as an advocate. In other words, I disagree with the majority's attempt to strictly limit the actions for which a social worker is absolutely immune to instances where she is "initiating court actions or testifying under oath," such that the majority characterizes these actions as being confined to filing a complaint or testifying in court. Indeed, the majority's extreme position was advanced by the petitioner in

The analytical key to prosecutorial immunity, therefore, is *advocacy* – whether the actions in question are those of an advocate. *See Buckley*, 509 U.S. at 273-74; *Kalina*, 522 U.S. at 125; *Pusey*, 11 F.3d at 658. By analogy, social workers are absolutely immune only when they are acting in their capacity as *legal advocates* – initiating court actions or testifying under oath – not when they are performing administrative, investigative, or other functions. The case before us turns on whether the actions of which Holloway complains were taken by Brush *in her capacity as a legal advocate.*

**IV**

As a caseworker, Brush's official position and responsibilities were defined by Ohio statutes. These provide that a "public children services agency . . . shall prepare and maintain a case plan for any child to whom the agency is providing services;" this applies, for example, when, as in this case, that agency has temporary custody of the child. Ohio Rev. Code Ann. § 2151.412(A) and (A)(2) (Baldwin 1994). Day-to-day responsibility for that case plan's management is in the hands of the caseworker. *Id.* at § 2151.416(B)(1). In such a situation, the agency preparing the case plan "shall attempt to obtain an agreement among all parties, including, but not limited to, the parents, guardian, or custodian of the child and the guardian ad litem of the child regarding the content of the case plan." *Id.* at § 2151.412(D).

Two aspects of this statutory scheme are of considerable relevance to this case. First, the agency, CCDHS, as temporary custodian of the children, was one of the *parties.* Second, it was a party with a statutorily created duty *to attempt to obtain the agreement of the other parties*, including the parents. As the agency caseworker, this was plainly Brush's responsibility, but Brush chose to construe her role otherwise. In violation of the clear mandate of the statute, she described herself to Holloway as her "adversary." Rather than first seeking to forge an agreement with Holloway, as the law required her to do, she refused to discuss the case with that parent. Instead, she advised Holloway to obtain an attorney.

Had Brush attempted to obtain Holloway's participation in the proceedings and agreement with the case plan, and failed to obtain such agreement, then perhaps Brush and Holloway would have become adverse parties in a court hearing. In that event, however, the advocate for the child services agency would be, not Brush, but the county prosecutor and assistant prosecutors. To be sure, in such a case, Brush would have absolute immunity for her testimony or recommendations given in court concerning the children's best interests as she saw the matter. But in claiming absolute immunity for her out-of-court actions as a caseworker, Brush arrogates to herself an adversarial and quasi-prosecutorial role which Ohio law did not intend her to have.

Once again, absolute immunity extends to social workers only when they are acting in the capacity of *legal advocates*. It is apparent that Ohio law does not envision a caseworker's principal function as that of an advocate, although at a certain stage in custody proceedings a caseworker might be called by the prosecutor to present reports or make recommendations that, functionally, constitute advocacy. But the acts for which Brush is being sued — failing to notify the trial court that Plaintiff had made contact and wished to assert her parental rights, telling Plaintiff that her rights had been severed when they had not yet been, and withholding information that would have enabled Plaintiff to raise her rights in court before her rights were severed — do not come within that description.

The information withheld by Brush in the case before us was not analogous to the evidence that may be analyzed, and presented or withheld, by a prosecutor in a criminal proceeding. Rather, it was the fact that a party long sought by the court had appeared and wished to address the court to assert her legal rights; it was the fact that the juvenile court's decision on the recommendations of the referee, who had held the December 15, 1992 hearing and filed the January 26, 1993 report, was still pending, and the fact that in April 1993 a hearing had been held to afford the children's *father* an opportunity to assert his rights; it was the fact that Holloway,

should be ignored. Perhaps this may be a viable argument under other circumstances, but in a case where the district court should have dismissed the case at the outset of Plaintiff's filing suit, it appears that the Court's turning one more deaf ear and one more blind eye to barriers for review is inappropriate and extreme. This is especially so where we must also liberally construe Plaintiff's complaint in order to find that she sued Ms. Brush in her individual capacity, inasmuch as Plaintiff never specified capacity in her complaint. *See Pelfrey v. Chambers*, 43 F.3d 1034, 1038 (6th Cir. 1995); *Wells v. Brown*, 891 F.2d 591, 593 (6th Cir. 1989).

With that said, I begin my analysis of the immunity issue with a recitation of the alleged actions of Ms. Brush of which Plaintiff complains. Specifically, Plaintiff claims that Ms. Brush denied Plaintiff her right to procedural due process of law when Ms. Brush 1) failed to notify the trial court that Plaintiff had made contact and wished to assert her parental rights, 2) told Plaintiff that her rights had been severed when they had not yet been, and 3) withheld information that would have enabled Plaintiff to raise her rights in court before they had been terminated.[11] It is important to keep in mind that these are the alleged actions for which Plaintiff complains, and that the inquiry into immunity, as well as the merits of the

---

[11]Plaintiff's amended complaint states in pertinent part as follows:
    SHE [MRS. HOLLOWAY] THEN CONTACTED THE DEPT[.] OF HUMAN SERVICES IN CLERMONT CO. IN BATAVIA[,] OHIO AT WHICH TIME A SALLY BRUSH THE CHILDREN[']S SOCIAL WORKER SET UP A TIME TO CALL HER[.] DURING THIS PHONE CALL MS[.] BRUSH INFORMED MRS[.] HOLLOWAY THAT THEY HAD TAKEN THE KIDS FROM THEIR FATHER AND THAT THEY HAD ALSO TAKEN AWAY HER PARENTAL RIGHTS[.] THEY COULD NOT TELL HER WHY OR EVEN HOW THEY THOUGH [sic] THEY COULD DO THIS, AND THEN THEY CUT OFF ALL CONTACT WITH HER WITHOUT ANY KIND OF PROVE [sic].
(J.A. at 10-11) (emphasis in original).

conceded. I simply see no due process violation on the part of Ms. Brush under these facts.

If the majority believes otherwise, as it must since it is remanding the case for trial, I would admonish the majority for making credibility findings about Ms. Brush such as she "lied" to Plaintiff, or "hid" Plaintiff, or "refused to discuss the case" with Plaintiff. These findings are completely inappropriate at this stage of the proceedings, unsupported by the record, and indicate the majority's unfounded bias against Ms. Brush. For example, based upon the above recitation of undisputed facts, it is difficult to imagine in what respect Ms. Brush "hid" Plaintiff. She told attorney Flessa of Plaintiff's whereabouts, advised Plaintiff to seek legal counsel, and informed her supervisor of the situation in the event Plaintiff telephoned while Ms. Brush was out of the office. One can just as easily surmise under these facts that Ms. Brush's actions were legally sound and in accordance with advice from attorney Flessa who assured her that no due process violation had occurred, as well as honorable in that she acted out of concern for what was in the children's best interests – which is paramount to the parents' interests under Ohio law. *See* Ohio Rev. Code Ann. § 2151.414(C) ("[A] court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child.").

Before addressing the immunity issue, I pause to take exception with the majority's decision to ignore yet another basis upon which to decline review – Plaintiff's failure to raise and argue Ms. Brush's immunity in this context, both in the district court as well as in her initial brief to this Court. Although it is true that *Ms. Brush* raised and argued that she was absolutely immune from liability below and to this Court, it is equally as true that Plaintiff failed to comply with two procedural prerequisites to this Court's review. *See White v. Anchor Motor Freight, Inc.,* 899 F.2d 555, 559 (6th Cir. 1990); *Wright v. Holbrook*, 974 F.2d 1152, 1156 (6th Cir. 1986). The majority contends that because Ms. Brush had an opportunity and in fact was the first to address her level of immunity in this regard, the Court's procedural prerequisites

had she not been misinformed by Brush, would have been able to ask the court for a similar hearing on *her* rights before a decision were made. This is not *evidence* in the case, but rather administrative information about the case and its posture.

Nor are Brush's actions analogous to a prosecutor's decision about whether a given witness shall or shall not testify, which is entitled to absolute immunity. *See Buckley*, 509 U.S. at 272-73 (citing *Imbler*, 424 U.S. at 430 n.32). Whatever latitude a prosecutor has to control the testimony of his witness is irrelevant here. Witnesses other than the defendant generally have no right to testify in criminal proceedings. But Holloway did have a right to be heard by the juvenile court. Moreover, Holloway was in no sense Brush's witness, and this is not a situation of a prosecutor's controlling Brush's actions. Holloway was a party, analogous to a defendant in a criminal proceeding, whose right to be heard in court may have been denied by Brush's actions under color of law.

Once such potential analogies to prosecutorial functions are seen as spurious, it is difficult to see in what sense Brush's actions were, in the words of the Magistrate Judge's Report and Recommendation adopted by the district court, "an integral part of the judicial process . . . ." It is true that Brush was involved "in initiating the court proceedings involving the Holloway children and in testifying on behalf of the interests of the children in court." *Ibid*. But those are not the actions complained of. It is her *out-of-court* actions, misinforming Holloway and failing to inform the court of the latter's appearance, that are the basis of this suit. Brush may have been an integral part of the judicial process at other stages. But such an involvement is not, by itself, sufficient for absolute immunity. The Supreme Court has explicated the appropriate standard on several occasions. "The question . . . is whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates'" (as opposed, for example, to auxiliary police) when they performed the actions complained of. *Buckley*, 509 U.S. at

274; *see also Kalina*, 522 U.S. at 125 (extending absolute immunity to prosecutors only where their challenged acts were performed while serving as an advocate in legal proceedings); *Pusey*, 11 F.3d at 658 (immunity turns on the prosecutor's role *as an advocate* intimately associated with the judicial phase of the criminal process). Even if Brush could successfully explain how failing to tell the court that Holloway had appeared and wished to assert her parental rights, lying to Holloway about her rights, and failing to inform Holloway that the matter was still pending were intimately connected with the judicial process, she has not explained how they were the functions of an advocate or consistent with her statutory role.

Nor are the actions of which Holloway complains analogous to recommendations made by caseworkers to the court, or the "formulation of professional judgments that served as the basis for" such recommendations, which the Third Circuit has held are entitled to immunity. *See Ernst v. Child & Youth Servs.*, 108 F.3d 486 (3d Cir. 1997). In *Ernst*, the court had the opportunity to evaluate the caseworkers' actions and to accept or reject their suggestions. In the case before us, Brush's actions *denied* the court the opportunity to accept or reject the results of her judgment. A jury could reasonably find that Brush appropriated the entire judicial process to herself by hiding Holloway and the court from each other and feeding them inaccurate information by act (in Holloway's case) and omission (in both cases). Even granting *arguendo* that Brush's actions were motivated by her "formulations of professional judgment," the actions themselves bear no resemblance to *recommendations* made to the court. They were, rather, *usurpations* of the court's authority. Even if such motivations could legitimate Brush's actions, it would be through qualified immunity, not absolute immunity, and she has not claimed qualified immunity.

## V

In addition to disagreeing with the above reasoning on the issue of Brush's absolute immunity, the dissent also raises a

and assured Ms. Brush that she "should not worry needlessly about [Plaintiff] disrupting the whole process. We did everything legally as to publication/notice." *Id.* The next day, June 16, 1993, Ms. Brush called attorney Flessa and requested a copy of the letter that he told Ms. Brush he was sending to Plaintiff; the CCJC filed an order adopting the referee's recommendation that the CCDHS be awarded permanent custody of the children. *Id.* Plaintiff did not contact the CCJC until February 15, 1995 – despite being directed by the Kansas District Court to do so some eighteen months beforehand, and only after it was recommended in the Ohio District Court that the State of Ohio and Ohio Department of Human Services be dismissed from suit – at which time an attorney was appointed for Plaintiff and she sought a reversal of the court's permanent custody order.

Under these facts, and considering that Plaintiff's counsel conceded at oral argument that Ms. Brush did all that was necessary to serve Plaintiff with notice of the hearings, I find Plaintiff's § 1983 claim against Ms. Brush for denial of procedural due process to be without merit. Ms. Brush did not deny Plaintiff notice of any hearing nor an opportunity to be heard, the fundamental elements of due process. *See Yellow Freight v. Sys., Inc. v. Reich*, 27 F.3d 1133, 1140 (6th Cir. 1994); *see also* Affidavit of Judge Stephanie A. Wyler (attesting that in her capacity as Clerk of the Clermont County Juvenile Court, at the time Ms. Brush first became aware of Plaintiff's surfacing on May 20, 1993, no other judicial proceedings were scheduled for which Ms. Brush could have provided notice to Plaintiff) (Supplemental Brief of Appellee, Addendum B). The fact of the matter is that Plaintiff surfaced nearly three years after the children had been taken into temporary custody; five months after the magistrate found by clear and convincing evidence that it was in the children's best interests for the CCDHS to be awarded permanent custody, where the children were together and living with a foster family that wanted to adopt them; and twenty-seven days before the permanent custody order was actually entered by the district court. And of course, well after Ms. Brush had made every attempt to locate Plaintiff and serve her, as

CCDHS be awarded permanent custody of the children, finding by clear and convincing evidence that such a disposition was in the children's best interests. At the hearing, Plaintiff's husband testified that Plaintiff had abandoned him and the children. *Id.* at 1220. Five months after the hearing was held and the recommendation was made, (about two and one-half years after the children were taken into custody by the CCDHS), on May 18, 1993, Ms. Brush received copies of correspondence between Plaintiff and the State of Washington Department of Social Services regarding Plaintiff's current whereabouts in Iola, Kansas, and called the CCDHS legal representative, Thomas Flessa, to provide him with this information. (Supplemental Brief of Appellees at 27, Addendum C, Holloway/Dictation).

About two days later, on May 20, 1993, Ms. Brush received a letter directly from Plaintiff that included Plaintiff's telephone number and current address. Ms. Brush called the telephone number that day and reached "City Hall." Ms. Brush left a message for Plaintiff, making an appointment to call her on Friday, May 21, 1993 at 3:15 p.m. *Id.* Ms. Brush contacted Plaintiff by telephone on the twenty-first, and told Plaintiff that the children had been in the custody of CCDHS for nearly the past three years, that the children were in a foster home where they might be adopted, that the CCDHS had permanent custody of the children, and that Plaintiff should talk to an attorney "about her rights." *Id.* On May 24, 1993, Ms. Brush attempted to telephone Plaintiff, but received no answer; Ms. Brush explained the situation to her supervisor, Debbie Penders, in the event that Plaintiff called back while Ms. Brush was out of the office that day. *Id.*

On May 27, 1993, Ms. Brush received a letter from Plaintiff, and she gave a copy of the letter to attorney Flessa who informed her that he would explain the CCDHS's position to Plaintiff. *Id.* at 28. Ms. Brush responded to Plaintiff's letter on June 2, 1993 summarizing their May 21 telephone conversation. *Id.*; J.A. at 93. On June 15, 1993, Ms. Brush contacted attorney Flessa, who once again informed Ms. Brush that he was writing a letter to Plaintiff

variety of reasons justifying its new-found assertion that this court lacks subject matter jurisdiction in this action — a position that the dissent admits the *Holloway* panel somehow failed to consider before. Its exhaustive arguments in favor of dismissal on that basis — whether based on attempted application of the doctrines of the law of the case, or *Rooker-Feldman* — all founder on the plain fact that the case before this court simply is not a custody case, but a § 1983 damages claim. That Holloway would *also* like this court to restore her children to her, which it cannot do, is irrelevant (though unsurprising given that she still has not been heard in a proper forum). The dissent's literalistic construction of her pro se pleadings against her, to divine "the true nature of the complaint," and uncover there a bid for custody "under the guise of" an action for damages, invites in this instance a return to the formalisms of the writ system with its traps for the unwary, an invitation that we decline on numerous grounds, not least that it contravenes the injunction of Fed. R. Civ. P. Rule 8(f), that pleadings are to "be so construed as to do substantial justice."

"The doctrine of law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332, 347 (1979). The issue of Brush's immunity from suit, the grounds of the district court's grant of summary judgment, was never raised, much less decided, in any earlier action in which Holloway was involved, whether in Ohio or Kansas. The Kansas district court, in particular, never even mentioned damages (which Holloway was not seeking in that action), nor Sally Brush (whose name appears solely in the caption as a defendant), nor the question of immunity from § 1983 liability; it simply dismissed Holloway's plea for the return of her children as beyond a federal court's limited subject matter jurisdiction. *See Holloway v. State of Ohio*, 1993 WL 302240 (D. Kan. July 27, 1993). Had that court opined on the issue at bar, an issue that was not before it, the result would have been not the law of the case but, at best, dicta; in any event, it did not.

Almost three months later, that same court denied Holloway's motion to reconsider, which added for the first time a request for "compensation in the amount of $2,000,000.00 for the pain and suffering caused by the termination of her parental rights." *See Holloway v. State of Ohio*, 1993 WL 463426 (D. Kan., Oct. 18, 1993). In disposing of the motion as one for relief under Fed. R. Civ. P. Rule 60(b), the court did not discuss Sally Brush, nor any of her actions complained of here, much less immunity therefrom, and it once again held subject matter jurisdiction lacking. "The basic rule that dismissal for lack of subject matter jurisdiction does not preclude a second action on the same claim is well settled." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4436 (1981) (citing *Hughes v. U.S.*, 4 Wall. (71 U.S.) 232, 237 (1866), and other cases). Although the dissent is not arguing that principles of preclusion apply here, the reason they do not is the same as the reason that law of the case principles do not apply either: there has been no adjudication of the issue on the merits, whether that be as a final judgment (which would have preclusive effect) or as  a matter decided before final judgment (when law of the case rules might apply). A "dismissal for lack of jurisdiction" does not "operate[] as an adjudication on the merits" for preclusive purposes. Fed. R. Civ. P. Rule 41(b). Similarly, "the law of the case is . . . based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 198 (1950). When a case is dismissed or a motion denied for lack of subject mater jurisdiction, nothing has been "litigated and decided" and neither set of principles comes into play. The merits of Holloway's damages claim were neither litigated nor decided by the Kansas district court, nor is that claim at all the same as the one before us, save in the eyes of the dissent. The denial of her later motion thus adds no force to the dissent's law of the case argument.

The dissent's alternative basis in the *Rooker-Feldman* doctrine begs the question. That doctrine teaches that federal courts have no subject matter jurisdiction to entertain federal

I begin by stating my belief that Plaintiff has failed to state a viable procedural due process claim against Ms. Brush. Plaintiff's counsel admitted during oral argument that if the Court found that Plaintiff failed to state a claim against Ms. Brush, the immunity issue need not be reached; Plaintiff also agreed that we could affirm the district court on this alternative ground. Based upon the sequence of events in this case, I find Plaintiff's claim against Ms. Brush without merit. Plaintiff surfaced twenty-seven days before the permanent custody order was entered, which was after the case was more than two and one-half years in the making, and Ms. Brush did everything to notice Plaintiff of the hearings, as conceded by Plaintiff.

To recap these events, in November of 1990, the CCDHS filed a complaint in the Clermont County Court of Common Pleas, Juvenile Division, ("CCJC") alleging that the children were dependent and requesting temporary custody. *See Holloway*, 684 N.E.2d at 1218. The CCJC determined that the children were living in an unhealthy environment and granted the CCDHS temporary custody. *Id.* In January of 1991, the CCJC ordered that the complaint be amended to include a request for permanent custody. *Id.* The CCDHS, through Sally Brush, attempted to serve Plaintiff with a copy of the amended complaint by certified mail, and when that failed, it attempted to serve Plaintiff via publication. *Id.* In February of 1992, the CCJC adjudicated the children dependent and continued the agency's temporary custody. *Id.*

The children were placed with relatives in the state of Washington; however, that placement failed, and in September of 1992, the CCDHS filed a motion for permanent custody. *Holloway*, 684 N.E.2d at 1218. Once again, the CCDHS attempted to serve Plaintiff notice of the motion by publication. *Id.* Brush filed an affidavit with the CCJC in which she stated that she was unable to obtain a current address for Plaintiff, despite her calls to social service agencies in Arizona, Washington, Oklahoma, California, and Colorado. On December 15, 1992, a hearing on the motion was held, and it was recommended by the referee that the

requirement of seeking direct review in the United States Supreme Court by casting her lawsuit as a section 1983 action, *Feldman's* jurisdictional bar applies."); *Duby v. Moran,* 901 F. Supp. 215, 216-17 (S.D. W.Va. 1995) (dismissing the plaintiff's § 1983 due process claim seeking the return of her children and damages, for lack of subject matter jurisdiction under *Rooker/Feldman*, while concluding that the plaintiff's recourse was with the United States Supreme Court).

### D.  Summary

In summary, I would affirm the district court's order dismissing Plaintiff's case; however, I would do so on different grounds. *See Jackson v. City of Columbus*, 194 F.3d 737, 756 (6th Cir. 1999) (citing *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985)). Specifically, I would affirm the district court's dismissal on the basis of the law of the case doctrine or for lack of subject matter jurisdiction.

Although I firmly believe the district court and this Court alike should not be exercising our heavy hands in reaching the immunity issue here, I will address the matter in the section that follows because I believe with even greater conviction that Sally Brush is entitled to absolute immunity for her actions at issue in this case which were prosecutorial in nature.

### III. PLAINTIFF'S § 1983 PROCEDURAL DUE PROCESS CLAIM AND THE LEVEL OF IMMUNITY AFFORDED TO DEFENDANTS IN THIS MATTER

I agree that Clermont County was properly dismissed for the reasons stated by the majority; however, I strongly disagree with the majority's position that the district court erred in granting Sally Brush absolute immunity in connection with her actions for which Plaintiff complains, particularly in this case which I believe is without merit.

constitutional claims that are "inextricably intertwined" with a state court's ruling in an earlier action, when their adjudication would be tantamount to a "review [of] the state court decision." *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 n.16 (1983). No court, save the district court whose decision we review here, has addressed the question of whether Brush enjoys immunity from suit for her alleged acts. The dissent assumes precisely what is at issue: it thinks *Feldman* is applicable because it assumes that acts undertaken in the course of the custody proceedings were an integral part of those proceedings, hence entitled to absolute immunity. But even a decision that they are not so entitled does not constitute a review of the custody decision, which is an entirely separate, state matter. Those courts have held that Holloway's parental rights were severed without a proper hearing; the question before us is rather whether certain actions in the course of those proceedings may have involved a violation of her federal constitutional rights for which the responsible party may be held liable for damages. The conceptual distinction could not be more clear.

Holloway has not sought § 1983 damages against Brush in state court, and her complaint there that severance of her parental rights constituted a due process violation rested only on a claim of insufficient notice; notice can be fatally defective, and was held to be in this case by the Ohio courts, without any question of personal liability being raised. Indeed, the claims against Brush that we permit to go forward do not relate to the defects in notice found by the Ohio courts. Once again, Holloway was not seeking damages in state court, but the re-opening of custody proceedings. It is the dissent, not Holloway, who keeps entangling these separate matters.

Consequently, it is clear that the domestic relations exception to federal jurisdiction has no applicability. In considering this case, this court has not trespassed in any way on the state courts' appropriate jurisdiction over the underlying child custody dispute. Nor have we expressed in the slightest degree any view as to the merits of one side or the other in that matter. The dissent, on the other hand, does

not disguise its hostility to Holloway's desire for the restoration of parental rights, but rather evinces a curious animus against her on the merits, repeatedly opining that finality in this case is in the children's best interest, as well as showing an Olympian disdain for her search for damages with which "to cover expenses for a short period of time." *Infra* at 68.

To focus at length, as the dissent does, on whether notice to Holloway was or was not defective, as though that were the basis for this complaint, and to insist that such notice's sufficiency was "conceded" by Holloway, is idle, quite apart from the fact that the Ohio Court of Appeals has not conceded this, but has held that notice by publication was insufficient in this case. *See supra* at 6. Notice to Holloway is hardly the issue here. The real issue is whether Brush's alleged failure to notify the court that Holloway had finally surfaced, while its decision on permanent custody was still pending, and her alleged concealment from Holloway of that pendency, was a violation of Holloway's rights to which liability attaches.

Nor does the children's best interest, which is not before this court, and as to which this court holds no view, have any bearing on the sole issue at bar, which is whether Brush enjoys absolute immunity in a § 1983 suit for monetary damages for her actions. The dissent's belief that social workers should and do enjoy absolute immunity whenever they undertake any act in what they regard as a child's best interest, *see infra* at 67-68, goes far beyond the traditional, prosecutorial, basis for such immunity and would permit to go unredressed even the most blatant forms of discrimination or other constitutional violation.

## VI

What Brush did was not the evaluation and presentation of evidence. It was not controlling the testimony of her witness. It was not intimately associated with the judicial process, nor was it the function of an advocate. Finally, it was not a recommendation to the county court. It was a usurpation of the judicial process that denied Holloway her right to be heard

Jefferson County, Colorado, claiming that the defendants violated his right to equal protection and due process of law by awarding mothers custody of children in child custody disputes. The plaintiff sought declaratory and injunctive relief under § 1983, as well as a writ of habeas corpus directing that his son be returned to his custody. *See id.* In affirming the district court's dismissal of the plaintiff's claim, the Court of Appeals for the Tenth Circuit first noted that the Plaintiff's attempt to invoke federal habeas jurisdiction was foreclosed under *Lehman. Id.* The Tenth Circuit then found that under the *Rooker/Feldman* doctrine, the court lacked jurisdiction to hear the § 1983 claims because the plaintiff was making a specific challenge to a state court decision where the relief sought was in the nature of appellate review of a state court judgment. *Id.* The court concluded that the plaintiff's "recourse, if any, is to exhaust his appeals in the Colorado courts and to petition the Supreme Court of the United States for certiorari review of the decision of the state supreme court." *Id.* at 264.

Likewise, in the present case, to the extent that Plaintiff requests that the district court order Defendants to return her children to her, she is attempting to invoke federal habeas jurisdiction in violation of *Lehman. See* 458 U.S. at 516. Furthermore, as in *Anderson*, her § 1983 claim is precluded under the *Rooker/Feldman* doctrine because she is attempting to seek an impermissible appellate review by the federal district court of the state court's custody determination. *See Anderson,* 793 F.2d at 263-64. Plaintiff's recourse at the time she filed suit in the district court was to exhaust her state court remedies and appeal any unfavorable decision of the Ohio Supreme Court to the United States Supreme Court. *See id.* In light of the state court proceedings filed in this case after Plaintiff filed her claim in the district court, *see* time line *supra* Part II.A., Plaintiff's remedy was to petition for writ of *certiorari* to the United States Supreme Court challenging the Ohio Supreme Court's denial of her state writ of habeas corpus. *See id.*; *see also* 28 U.S.C. § 1257; *Feldman,* 460 U.S. at 482-86; *Keene Corp. v. Cass,* 908 F.2d 293, 296 (8th Cir. 1990) ("Where a litigant attempts to circumvent the

process commands were not met based upon allegations made by Plaintiff regarding Ms. Brush. Had the district court made such a determination, the result would have been to declare the permanent custody order invalid as unconstitutionally obtained. Such a determination by the district court may not have been in the best interests of the children as determined by the state court; an issue which lies at the heart of any child custody matter. Indeed, as noted *supra*, the Ohio Supreme Court affirmed the denial of Plaintiff's application for writ of *habeas corpus* because it would not have been in the children's best interests to return the children to Plaintiff. *See Holloway*, 684 N.E.2d at 1219-20. Furthermore, *Rooker/Feldman* is also satisfied because Plaintiff clearly is "challeng[ing] [a] state court decision[] in [a] particular case arising out of judicial proceedings [while] alleging that the state court's action was unconstitutional." *See Feldman*, 460 U.S. at 485-86. Simply put, Plaintiff is challenging the CCJC's decision to award the CCDHS permanent custody of her children as being unconstitutional.[10] *See id.*

In *Anderson v. Colorado,* 793 F.2d 262, 263 (10th Cir. 1986), the plaintiff brought a § 1983 action against the State of Colorado and the judges of the First Judicial District of

---

[10]The majority claims that the *Rooker/Feldman* doctrine does not apply because no court, save the district court, has addressed the affirmative defense of absolute immunity as applied to Ms. Brush. However, in focusing on the immunity defense, once again the majority misses the point that what is at issue here is Plaintiff's *claims* and whether those claims are inextricably intertwined with the custody matters in state court. If so, the district court and this Court as well lacked jurisdiction to hear the matter. The immunity defense only comes into play once jurisdiction has been properly invoked. As stated throughout the dissent, and as made patently clear by Plaintiff's own actions, Plaintiff's tort claims were brought in an attempt to seek a custody decree from the federal district court. Plaintiff makes a specific challenge to a state court decision where the relief she sought was in the nature of federal appellate review of a state court decision, such that the United States Supreme Court was the proper forum to hear her claim. *See Keene Corp. v. Cass,* 908 F.2d 293, 296 (8th Cir. 1990) (finding that a litigant cannot circumvent the requirement of seeking direct review in the United States Supreme Court by casting her lawsuit as a § 1983 action under *Feldman*).

---

in court. The proper test is whether Brush has carried her burden of establishing that she was functioning as an advocate when she performed the actions complained of. *See Buckley*, 509 U.S. at 574. She was not. The judgment of the district court granting summary judgment on grounds of absolute immunity to Defendant Brush is **REVERSED**.

## VII

Finally, this court notes with concern the fashion in which Clermont County has proceeded in this litigation. Over three years ago, the Court of Appeals of Ohio set aside the order of the Clermont County Court of Common Pleas granting permanent custody of the Holloway children to CCDHS, and remanded the case for further proceedings, ordering as follows: "the trial court is directed to set aside its previous order granting permanent custody of the children to CCDHS and to obtain proper service of process upon appellant [Sammye Holloway] before conducting a hearing on the merits." *In re Holloway*, No. CA95-09-064, 1996 WL 227481 at *3 (Ohio Ct. App. May 6, 1996) (unpublished). There was no hearing. Holloway pursued the matter by moving in the state trial court for immediate reunification. At a pretrial conference on her Motion to Begin Reunification, held on June 20, 1996, CCDHS stated its intention to serve her with a complaint seeking permanent custody. *See* Twelfth Appellate District Court of Appeals, Original Action in Habeas Corpus, Case No. CA96-06-052, Stipulated Statement of Evidence, at ¶ 53 (October 11, 1996). No complaint was served. Over a year later, the Ohio Supreme Court turned aside Holloway's petition for a writ of habeas corpus, noting that Holloway would have her day in court in Clermont County, as ordered by the Court of Appeals: "[t]here is nothing to indicate that CCDHS will not promptly serve such complaint [seeking permanent custody anew] following completion of this action or that Holloway's participation in the juvenile court proceedings will be either futile or time-consuming." *Holloway v. Clermont County Dep't of Human Servs.*, 80 Ohio St. 3d 128, 131, 684 N.E.2d 1217, 1220 (Ohio 1997). Still no complaint was served, no proceedings held.

With this factual background, at oral argument before a panel of this court on April 30, 1998, CCDHS reiterated its intention to file a renewed complaint. None was filed. On the contrary, CCDHS astonished this court sitting en banc when, in oral argument on December 9, 1999, counsel announced that CCDHS had no intention of obeying the orders of its state courts, no intention of honoring its repeated statements to this court, and no intention of ever reopening custody proceedings. As though it were only an afterthought, CCDHS revoked its word, given by its attorneys as officers of the court to a panel of this court to its face, as well as to the Ohio Court of Appeals and the Ohio Supreme Court. This action was not consistent with the County's duty of candor to this court.

As of this date, Holloway continues to be denied her parental rights without their having been severed judicially. The Supreme Court has long recognized that "[a] parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is . . . a commanding one." *Lassiter*, 452 U.S. at 27. If Clermont County now intends not to comply with the ruling of the Ohio Court of Appeals, this court was entitled to know of that change of position without our having to elicit it by questioning at oral argument.

the merits of Plaintiff's § 1983 claim required review of a matter inextricably intertwined with the state custody matter. Although Plaintiff couched her claim as a civil rights action under § 1983, the relief that she clearly sought was the return of her children through a finding by the district court that the CCJC, via Sally Brush and Clermont County, acted without due process of law. In other words, Plaintiff was seeking federal appellate review of the state custody decree through the filing of her § 1983 claim.[9]

In any event, the *Rooker/Feldman* doctrine is satisfied because "federal relief could only be predicated upon a conviction that the state court was wrong . . . ." *Pennzoil,* 481 U.S. at 25. Here, the district court could not have adjudicated Plaintiff's § 1983 claim without determining that the due

---

[9] Again, one need look no further than the sequence of filings in state and federal court to see my point. For example, the CCJC entered the permanent custody order on June 16, 1993; two days later, Plaintiff filed suit in the Kansas District Court seeking the return of her children; one month later, the Kansas District Court dismissed her suit for lack of subject matter jurisdiction; about one month later, Plaintiff filed what was interpreted as a Rule 60(b) motion incorporating the same § 1983 claims that she asserts here; and about one month after filing her motion, the Kansas District Court dismissed her case once again for lack of subject matter jurisdiction. Five months later, on March 17, 1994, Plaintiff filed suit in the Ohio District Court, raising the same claims; Defendants filed a motion to dismiss the suit, Plaintiff responded, and on January 18, 1955, the magistrate entered his report and recommendation that the State of Ohio and the Ohio Department of Human Services be dismissed. Less than one month later, after it became obvious that the State of Ohio and Ohio Department of Human Services was going to be dismissed, Plaintiff filed suit in the CCJC seeking a reversal of the court's permanent custody order. However, by that time, it had been eighteen months since the CCJC had entered its permanent custody order. Had the district court dismissed Plaintiff's claim when she filed suit on March 17, 1994, as was done by its sister court in Kansas, Plaintiff likely would have sought reversal from the CCJC immediately, meaning that she would have been in the proper forum to challenge the permanent custody order a full year before the time she ultimately filed there. Moreover, had Plaintiff appealed the Ohio Supreme Court's denial of her writ of habeas corpus to the United States Supreme Court instead of waiting for a determination from this Court on appeal, she would have been in the proper forum to receive the relief that she was actually seeking.

not have jurisdiction . . . over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional."[8] *Feldman*, 460 U.S. at 485-86.

In this case, as discussed in relation to the domestic relations/child custody exception to jurisdiction, a decision on

---

[8] I digress at this juncture to point out what I believe to be a finding in *Catz* which is contrary to *Feldman.* Specifically, in *Catz,* this Court relied upon the above-quoted passage from *Feldman* when it found that the second element necessary to applying *Feldman* was that "the action brought in the district court [had to] be a 'general challenge' to the constitutionality of the state law applied in the state action, rather than a 'specific grievance' that the law was invalidly – even unconstitutionally – applied in the plaintiff's particular case." *Catz*, 142 F.3d at 293-94. Actually, *Feldman* held that "United States District Courts . . . have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final judgment in a particular proceeding." *Feldman*, 460 U.S. at 486. In other words, *Feldman* did not hold that an action must "be a general challenge to the constitutionality of the state law applied in the state action" in order for the doctrine to apply, as claimed by *Catz*; rather, *Feldman* held just the opposite. Which is to say, *Feldman* held that for the doctrine to be invoked, a litigant must be "challeng[ing] [a] state court decision[] in [a] particular case[] arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this [Supreme] Court." *Id.* (citing 28 U.S.C. § 1257). The "general challenge" spoken of in *Feldman* was in regard to state bar rules promulgated by state supreme courts in their *non-judicial* capacity, which the Supreme Court therefore found did "not necessarily require a United States District Court to review a final state court judgment in a judicial proceeding," so that jurisdiction by the district court could be invoked. *Id.* However, *Feldman* also stated that a United States District Court does *not* have jurisdiction to hear a claim "that a state court has unlawfully denied a particular applicant admission." Therefore, the "general challenge" requirement of *Feldman* was only in reference to the fact that such a challenge was based upon a non-judicial proceeding. *Feldman* in no way held that a state court litigant filing a claim in federal district court must be making a general challenge to the constitutionality of a state law as opposed to a specific grievance as claimed in *Catz*. Rather, *Feldman* bars "a United States District Court [from] review[ing] a final state court judgment in a judicial proceeding." *Id.*

---

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  I dissent in this case because, unlike the majority, I refuse to turn a blind eye to the simple truth of the matter.  This case is nothing more than an improper attempt by Plaintiff to use the heavy hand of the federal court to usurp the state court's authority in a child custody case.  In its judicial activism, the majority has ignored the truth of this matter in order to set an unwarranted precedent in this circuit regarding the level of immunity to be afforded social workers.

The original decision in this case held that summary judgment was appropriately granted to Ms. Brush on immunity grounds because Plaintiff limited her argument regarding Ms. Brush's immunity to whether the juvenile court acted without jurisdiction.  *See Holloway v. Ohio*, 179 F.3d 431, 439 & n.4, *reh'g en banc granted, vacated by* 197 F.3d 236 (6th Cir. 1999).  The opinion only addressed the issue of Ms. Brush and absolute immunity in *dicta.*  *Id.*  Therefore, no precedent was set regarding social workers and the level of immunity they are afforded.

After the original panel issued its decision affirming the district court's dismissal of Plaintiff's case, she did not petition for rehearing.  Rather, Plaintiff filed another petition for a writ of habeas corpus with the Ohio Supreme Court seeking the return of her children, which the Ohio Supreme Court subsequently denied.  Indeed, it was only upon the suggestion of the author of the majority opinion herein that this case was brought before the *en banc* court.  Interestingly, this case was heard *en banc* on the issue of whether Ms. Brush should be afforded absolute immunity for her actions as complained of by Plaintiff, despite the fact that the majority opinion of the original panel did not base its holding on this premise.

By hearing this case *en banc*, the majority accomplished its goal of creating precedent on the issue of absolute immunity and social workers. However, in the course of doing so, the majority has ignored fundamental principles of law such as the law of the case doctrine and subject matter jurisdiction, and has engaged in judicial activism of the worst kind. Because I choose not to engage in this kind of overreaching, and because I also disagree with the majority's outcome, I respectfully dissent.

## I. BACKGROUND

This is a meritless § 1983 action involving an embroiled child custody dispute that was dismissed by the United States District Court in Kansas; that was on going in the Ohio state courts at the time the Ohio District Court rendered its decision; that is still on going in the Ohio state court at the current time; and that was actually filed in the federal district courts by Plaintiff in an effort to seek a custody decree and the return of her children. Under these facts, I believe that the case was properly dismissed by the Ohio District Court below. However, in my opinion, the district court should have dismissed the matter under the doctrine of the law of case or for lack of subject matter jurisdiction. Plaintiff's source of relief was with the Ohio state courts and ultimately in a petition for a writ of *certiorari* to the United States Supreme Court, not in federal district court.

Indeed, Defendants brought a motion to dismiss for lack of subject matter jurisdiction in the Ohio District Court. The fact that Defendants' motion and these jurisdictional bars were not addressed in the *Holloway* panel's decision is of no moment to their consideration now, because "federal courts, being of limited jurisdiction, must examine their subject-matter jurisdiction 'throughout the pendency of *every* matter before them.'" *See Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1419 n.2 (6th Cir. 1996) (emphasis in original) (quoting *In re Wolverine Radio Co.*, 930 F.2d 1132, 1137 (6th Cir. 1991)). As this Court has observed, it is "beyond question" that we have a duty to

obligation" of every federal appellate court to satisfy itself of the lower court's jurisdiction in a cause under review).

### 2. The *Rooker/Feldman* Doctrine to Divest Jurisdiction

The *Rooker/Feldman* doctrine is based on 28 U.S.C. § 1257, which grants the Supreme Court jurisdiction to review the decisions of the highest state courts for compliance with the Constitution. *See* 28 U.S.C. § 1257; *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 467 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923). Under the doctrine, "lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments." *Gottfried v. Medical Planning Servs.*, 142 F.3d 326, 330 (6th Cir. 1998). "This is equally true in constitutional cases brought under § 1983, since federal courts must give 'full faith and credit' to the judicial proceedings of state courts." *Id.* (citing 28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 85 (1984); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 475-78 (1982); *Allen v. McCurry,* 449 U.S. 90, 103-05 (1980)). Stated otherwise, under the *Rooker/Feldman* doctrine, "[f]ederal district courts lack subject matter jurisdiction to review such final adjudications or to evaluate constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.'" *Valenti v. Mitchell,* 962 F.2d 288, 296 (3d Cir. 1992) (alteration in *Valenti*) (quoting *Feldman*, 460 U.S. at 483 n.16). The doctrine "has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion." *Valenti,* 962 F.2d at 297.

In order for the doctrine to apply, the "federal claim [must be] inextricably intertwined with the state-court judgment [such that] the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring). In addition, United States District Courts "do

Had the district court sifted through the claims made by Plaintiff, it would have determined that she is indeed seeking a custody decree from the district court. Plaintiff not only expressly requested that the court order the children returned to her, but she sought the return of her children through an adjudication from the district court that the CCJC's order was unconstitutionally obtained. The result of granting Plaintiff the relief that she seeks is of a particular concern where the Ohio Supreme Court expressly found that it "would not be in the children's best interest" to be returned to Plaintiff. *Holloway*, 684 N.E.2d at 1219-20; *see Lehman,* 458 U.S. at 513-14 ("There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents . . . ."). Moreover, the issue of whether the CCDHS properly served Plaintiff was pending in the Ohio Court of Appeals at the time Plaintiff's claim was before the district court thereby allowing for potentially contradictory results on the same issue. Accordingly, under the commands of *Ankenbrandt* and the domestic relations/child custody exception, the district court did not have jurisdiction over Plaintiff's case, and should have dismissed the case on this basis. *Bender,* 475 U.S. at 541 (noting the "special

---

*See* 504 U.S. 689, 705 (1992). Therefore, this holding implicitly prevents a federal district court from declaring a divorce or custody decree void – i.e., if the federal district court does not have the power to declare a married couple divorced, it follows that the district court does not have the power to declare a divorced couple once again married by virtue of finding that the divorce was unconstitutionally obtained. The confusion caused by such a result, to say nothing of the lack of deference to state courts which are best suited to adjudicate domestic matters, is obvious — particularly in matters of child custody where it is not merely the assets of a marriage and chattel that are at stake, but the lives of children who "require secure, stable, long-term, continuous relationships with their parents or foster parents." *See Lehman v. Lycoming County Children's Servs. Agency,* 458 U.S. 502, 513-14 (1982). As the Supreme Court opined, "[t]he State's interest in finality is unusually strong in child-custody disputes." *Id.* In the case at hand, the children were adopted on June 24, 1994, by their foster parents. *See Holloway v. State of Ohio*, No. 96-3732, Oral Argument by Defendants, Dec. 8, 1999.

---

inquire into the basis for subject matter jurisdiction and to dismiss the case if jurisdiction is lacking. *See Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 890 (6th Cir. 1998). The United States Supreme Court has expressly instructed that "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." *See Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986). Therefore, in light of these express commands, we *must* consider the issue of subject matter jurisdiction as it relates to the matter at hand. In doing so, it is clear that neither the district court below nor this Court has subject matter jurisdiction over this cause. The majority's attempt to minimize or balk at my concern regarding the jurisdictional issue flies in the face of the overwhelming authority directing an appellate court to "satisfy itself" that subject matter jurisdiction over a cause exists.[1]  *See id.*

Furthermore, even if we chose to be derelict in our duty and ignore the jurisdictional issue, I believe that Plaintiff's case should be dismissed for failure to state a due process claim against Sally Brush. Finally, should the immunity issue be reached, I believe that Ms. Brush is clearly entitled to absolute

---

[1] The majority attempts to cast a suspicious eye toward my concern with the lack of subject matter jurisdiction by calling it "new-found," while noting that "the dissent admits the *Holloway* panel somehow failed to consider [the issue] before." A federal court's concern over subject matter jurisdiction is continuing; it is never "new-found." The fact that the original panel in this case may have failed in their "special obligation" to examine the jurisdictional basis for this case  makes it even more imperative for this Court sitting *en banc* to satisfy itself of the existence of jurisdiction now, particularly where Defendants raised the issue before the Ohio District Court, and where the Kansas District Court dismissed the matter for lack of subject matter jurisdiction. Indeed, if suspicion is to be cast, it is toward the majority opinion's failure to bring to light that this action was originally filed by Plaintiff against Ms. Brush and the State of Ohio in the Kansas District Court on the same grounds as asserted by Plaintiff in the Ohio District Court, and dismissed by the Kansas District Court for lack of subject matter jurisdiction; as well as the fact that Defendants moved to dismiss this case in the Ohio District Court for lack of subject matter jurisdiction.

immunity for her actions in this matter. To hold otherwise under these facts will have the adverse result of causing social workers – members of a profession that is greatly understaffed for the essential societal purpose that they serve – to second guess their actions relating to child custody matters for fear of reprisal by disgruntled parents who are not properly caring for their children. As espoused by the Supreme Court, "if litigation expenses mount, social workers . . . may well become less willing to seek placements for children over their parents' objections, whether rational or irrational, even though in their honest judgment the child's best interests demand it." *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 514 n.18 (1982). The majority's opinion ultimately puts our children – arguably the most vulnerable members of our society – at risk of neglect, harm, and physical abuse.

## II. LAW OF THE CASE; LACK OF SUBJECT MATTER JURISDICTION UNDER THE DOMESTIC RELATIONS/CHILD CUSTODY EXCEPTION AND UNDER THE *ROOKER/FELDMAN* DOCTRINE

### A. Time Line of State and Federal Court Proceedings

An examination of the procedural events, substantive nature of Plaintiff's claims made in these proceedings, and supporting case law clearly indicates that this case should not have proceeded in the district court on a number of grounds. First, the district court should have deferred to the judgment of the Kansas District Court under the law of the case and dismissed Plaintiff's claim; in the alternative, the district court should have dismissed the case for lack of subject matter jurisdiction under the domestic relations/child custody exception to federal court jurisdiction or under the *Rooker/Feldman* doctrine.

To begin, a time line juxtaposing the events occurring in the state and federal court cases is beneficial for a proper understanding of the matter.

Court rested its decision on the fact that Catz was not asking the district court to involve itself "in the sort of questions attendant to domestic relations" such as "what custody determination would be in the best interest of a child." *Id.*

In this case, Plaintiff is not merely asking the federal court to "examine whether certain judicial proceedings, which happened to involve a [custody determination], comported with the federal constitutional guarantee of due process" that would thereby allow the federal courts jurisdiction over the matter. *See Catz,* 142 F.3d at 292. Rather, Plaintiff is asking the district court to grant her custody of her children by declaring that the custody decree entered by the CCJC was unconstitutionally obtained. The distinction is significant in that it removes the case from the bounds of *Catz,* and places it squarely within the domestic relation/child custody exception to jurisdiction espoused in *Ankenbrandt. See* 504 U.S. at 703. Clearly, at the "core" of Plaintiff's action she seeks a declaration of parental status; the fact that she also prays for money damages is of no moment to the true nature of the relief sought because the Supreme Court has made it clear that a federal district court lacks jurisdiction to enter a custody decree. *See Ankenbrandt*, 504 U.S. at 703; *Catz,* 142 F.3d at 291.

At first blush it may appear that like in *Catz,* Plaintiff is merely seeking a declaration that the custody decree was unconstitutionally obtained, and that the domestic relations exception does not apply. However, we are not to address custody cases in a superficial fashion; it is our duty to examine the true nature of the complaint to determine whether it seeks a custody decree.[7] *See Firestone,* 654 F.2d at 1216.

---

[7]Furthermore, I strongly question the holding in *Catz* which states that an adjudication from this Court finding that a divorce decree was unconstitutionally obtained is permissible under *Ankenbrant* because the divorce decree would nonetheless be regarded as a nullity if it had been unconstitutionally obtained. *See Catz v. Chalker,* 142 F.3d 279, 291 (6th Cir. 1998). Indeed, *Ankenbrandt* expressly holds that a federal district court does not have jurisdiction to render a divorce or custody decree.

plaintiff's contention, finding that the contract in dispute was part of a separation agreement which was incorporated into the divorce decree. *Id.* As such, we concluded that "[t]his case thus involves issues arising out of conflict over a divorce decree, and according to *Ankenbrandt*, comes within the 'domestic relations exception.' . . . [T]he federal court lacks jurisdiction, as this case is not a tort or contract suit that merely has domestic relations overtones, but is one seeking a declaration of rights and obligations arising from marital status." *Id.* at 413-14.

Plaintiff's claim in the case at hand is like that of *McLaughlin* because an adjudication of whether Plaintiff was denied due process of law requires the federal court to examine the substance of the custody matters via a determination of Brush's representations to Plaintiff. Therefore, as in *McLaughlin*, the district court did not have jurisdiction over the matter, where an adjudication of Plaintiff's due process claim required "a declaration of rights" as to whether Plaintiff lawfully no longer had custody of her children. *See McLaughlin*, 193 F.3d at 413-14. Moreover, as in *McLaughlin*, the issue of whether Plaintiff was denied due process of law in the course of the CCJC's termination of her parental rights was pending before the Ohio Court of Appeals at the time that the issue was being addressed by the district court below, thus providing a further basis for the lack of jurisdiction. *See id.* at 413.

In *Catz v. Chalker*, a case decided before *McLaughlin*, it was found that the domestic relations exception to jurisdiction did not apply even though the plaintiff sought a declaration from the court that the divorce decree was void as a violation of due process. *See* 142 F.3d at 291. This Court reasoned that "if the divorce judgment were unconstitutionally obtained, it should be regarded as a nullity, and any decree so stating would change nothing at all." *See id.* (citation omitted). The Court went on to opine that "the declaration Catz seeks would not itself address the merits, or ultimately dispose, of [the] divorce petition; she would be free to relitigate her marital status in state court." *Id.* Finally, the

| Date | State Court | Date | Federal Court |
|------|-------------|------|---------------|
| 6/16/93 | Clermont County Juvenile Court ("CCJC") enters order terminating Plaintiff's parental rights. | 6/18/93 | Plaintiff files action in Kansas U.S. District Court seeking order for Ohio courts to stop & desist all further proceedings involving her sons, & to show cause why they should not be returned to her. |
| | | 7/27/93 | Kansas U.S. District Court dismisses Plaintiff's claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(h)(3) & as frivolous under 28 U.S.C. § 1915(d). *See Holloway v. State of Ohio*, No. 93-4139, 1993 WL 302240 (D. Kan. July 27, 1993) (unpublished). |
| | | 10/18/93 | Kansas U.S. District Court denies Plaintiff's "Motion: For this courtto [sic] order fair hearing an [sic] suit for civil rights violations" under 14th Amendment for lack of subject matter jurisdiction. *See Holloway v. State of Ohio*, No. 93-4139-SAC, 1993 WL 463426 (D. Kan. Oct. 18, 1993) (unpublished). |

| Date | State Court | Date | Federal Court |
|---|---|---|---|
| | | 3/17/94 & 4/4/95 | Plaintiff files complaint in U.S. District Court for the Southern District of Ohio claiming violation of her rights under 42 U.S.C. § 1983 & § 1981, as guaranteed by the Sixth, Eighth & Fourteenth Amendments, naming the State of Ohio, the Ohio Dep't of Human Services, Sally Brush, & Clermont County Ohio as defendants. |
| | | | Plaintiff amends her complaint. |
| | | 8/1 & 8/26/94 | Defendants file motions to dismiss Plaintiff's complaint for lack of subject matter jurisdiction. |
| | | 8/10/94 | Plaintiff responds to Defendants' motion to dismiss claiming that Defendants "lied" during the custody hearing by claiming that Plaintiff abandoned her children; and seeking monetary damages as well as an order from the court for Defendants "TO RETURN MRS HOLLOWAYS [sic] CHILDREN TO HER . . . ." |

noted, in her response to Defendants' motion to dismiss, Plaintiff expressly challenges the substance of the testimony presented at the termination hearings, and expressly requests an order from the district court to return her children to her. (J.A. at 42-43.)  In addition, and perhaps most telling, is the fact that Plaintiff did not seek the return of her children from the CCJC until *after* the magistrate recommended that the State of Ohio and the Ohio Department of Human Services be dismissed from suit – i.e., she did not seek the return of her children from state court until after it became apparent that she could not obtain such an order from the federal district court.[6]  Likewise, she did not file a second petition with Ohio Supreme Court for a writ of habeas corpus until *after* the *Holloway* panel issued its opinion affirming the district court. It is patently clear that Plaintiff is attempting to use the heavy hand of the federal district court to strong arm the Ohio state courts regarding this child custody matter.  Like the plaintiff in *McLaughlin v. Cotner*, Plaintiff is simply "attempting to disguise the true nature of the action" by seeking monetary relief in her complaint.  *See* 193 F.3d 410, 413 (6th Cir. 1999).

The plaintiff in *McLaughlin v. Cotner* filed suit against her ex-husband claiming that she was seeking damages for breach of contract and tortious interference with a contract in regard to residential property under Ohio tort and contract law, and that the domestic relations exception to diversity jurisdiction did not apply.  *See* 193 F.3d at 413.  However, we rejected the

---

*Co.*, 654 F.2d 1212, 1215 (6th Cir. 1981) (citing *Denman v. Leedy*, 479 F.2d 1097, 1098 (6th Cir. 1973)).

[6]Specifically, the record shows that Plaintiff filed suit in federal district court on March 17, 1994; the magistrate issued his report and recommendation that the State of Ohio and the Ohio Department of Human Services be dismissed from suit on January 18, 1995; and it was not until that time, on February 15, 1995, that Plaintiff filed suit in CCJC seeking review and reversal of the court's custody determination.  *See* time line *supra* Part II.A.  The district court filed its order accepting the magistrate's recommendation and dismissing the State of Ohio and Ohio Department of Human Services from suit on February 24, 1995.  *See id.*

determination.[4] *See Drewes v. Ilnicki,* 863 F.2d 469, 471 (6th Cir. 1988); *see also Zak,* 698 F.2d at 801.

In the case at hand, although Plaintiff filed her claim in district court under the guise of 42 U.S.C. § 1983 seeking monetary damages, a close examination of the true character of Plaintiff's claim and her pleadings indicates that she is seeking a custody decree from this court.[5]   As previously

---

[4] The majority ignores this circuit's commands that it is "incumbent" upon us to examine the nature of a complaint to determine whether it actually seeks a custody decree such that the tort action is a mere pretense, when it cavalierly states "that Holloway would *also* like this court to restore her children to her, which it cannot do, is irrelevant." It is most "relevant" that Plaintiff is using the tort action and the strong arm of the federal district and appellate courts as a subterfuge to seek a custody decree.  Plaintiff's pattern of returning to state court only after she receives an unfavorable ruling from the federal forum is indicative of her motivation in turning to the federal courts.  As stated by the Kansas District Court in this regard:

> Holloway alleges that the termination of her parental rights violated the . . . Fourteenth Amendment . . . .  Holloway also alleges violation of her civil rights. . . .
>      Holloway's motion appears to suggest that because the State of Ohio did not provide her with a fair hearing in the first instance, this court must have jurisdiction to consider this case. This is an incorrect interpretation of federal subject matter jurisdiction.  The mere fact that a litigant has received an unfavorable result in a state court does not, in and of itself, form the basis of federal subject matter jurisdiction.  In short, federal courts are not, subject to limited exceptions not relevant here, an avenue by which litigants may relitigate cases previously decided in state courts.

*Holloway v. State of Ohio*, No. 93-4139-SAC, 1993 WL 463426, at *1-*2 (D. Kan. Oct. 18, 1993).

[5] The fact that Plaintiff brought her claim under 42 U.S.C. § 1983 in order to contrive federal court jurisdiction is of no moment to the application of the domestic relations exception.  This Court has long recognized that "[e]ven when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court." *Firestone v. Cleveland Trust*

---

| Date | State Court | Date | Federal Court |
|---|---|---|---|
| | | 1/18/95 | Magistrate files a Report & Recommendation finding that court has jurisdiction over the matter; & recommending that claims against State of Ohio & Ohio Dept. of Human Services be dismissed, but claims against Clermont County & Sally Brush go forward. |
| | | 1/27/95 | Plaintiff files objections to Report & Recommendation |
| 2/15/95 | Plaintiff files motion in CCJC seeking review of court's permanent custody determination & reversal of court's previous judgment. | | |
| | | 2/24/95 | District Court enters order accepting Magistrate's recommendation to dismiss State of Ohio & Ohio Dept. of Human Services |
| | | 3/10/95 | District Court orders Plaintiff to show cause why summary judgment should not be entered *sua sponte* against her; orders Defendants to supplement record in response. |

| Date | State Court | Date | Federal Court |
|------|-------------|------|---------------|
| 8/22/95 | CCJC overrules Plaintiff's motion. Plaintiff appeals to the Ohio Court of Appeals for Clermont County. | | |
| | | 9/18/95 | District Court orders Defendants to, among other things, brief the issue of immunity regarding the motion for summary judgment. |
| | | 10/13/95 | Defendants file brief in support of immunity. |
| | | 4/16/96 | Defendants Clermont County & Sally Brush file motion for summary judgment. |
| | | 4/23/96 | Plaintiff responds to motion. |
| 5/6/96 | Ohio Court of Appeals reverses the ruling of the CCJC; orders that the CCJC set aside its previous order granting Clermont County permanent custody; & orders Clermont County Dep't of Human Servs. ("CCDHS") to obtain proper service over Plaintiff. *See In re Holloway*, No. CA95-09-064, 1996 WL 227481 (Ohio App. 12 Dist., May 6, 1996) (unpublished). | | |

overrule the custody determination made by the CCJC; and requests that the district court order Defendants to return her children to her. As such, under the district court's own opinion, Defendants' motion to dismiss for lack of subject matter jurisdiction should have been granted.

Furthermore, because Plaintiff's claim in this case, although filed under the guise of a § 1983 claim, is actually a challenge to the substance of the state custody determination which seeks the return of her children, and not simply a challenge to the procedures leading up to the decision, the district court erred in concluding that it had jurisdiction over the matter under the domestic relations/child custody exception to jurisdiction as well as the *Rooker/Feldman* doctrine. *See* 28 U.S.C. § 1257; *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 486 (1983) ("[Federal district court's do not have jurisdiction] "over challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional."); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923).

### 1. The Domestic Relations/Child Custody Exception to Federal Court Jurisdiction

Traditionally, federal courts have declined to accept jurisdiction in parent-child, domestic relations or custody disputes, and adoption matters subject to state law. *See Ankenbrant v. Richards,* 504 U.S. 689, 703 (1992) (concluding "that the domestic relations exception . . . divests the federal courts of power to issue divorce, alimony, or child custody decrees"); *Catz v. Chalker*, 142 F.3d 279, 292 (1998); *see also Zak v. Pilla,* 698 F.2d 800, 801 (6th Cir. 1982) (*per curiam*). It is "incumbent" upon a federal court to carefully examine the nature of a complaint to determine whether it is actually concerned with a custody issue – i.e., whether it actually seeks a child custody decree. *See Firestone v. Cleveland Trust Co.*, 654 F.2d 1212, 1216 (6th Cir. 1981). Jurisdiction is absent in those cases where the alleged tort action is a mere pretense and the suit actually seeks a custody

that perjured testimony was presented regarding Plaintiff's abandonment of her children, she also *expressly* requested that the district court order Defendants to return her children to her:

> NOT ONLY DID THEY LIE TO MRS HOLLOWAY IN MAY BY TELLING HER RIGHTS HAD ALRESDY [sic ] BEEN TAKEN BUT ALSO MUST HAVE LIED TO THE COURTS IN JUNE[,] JULY[,] AND JANUARY [various custody hearing dates] WHEN THEY CLAIMED ABANDONMENT ON HER PART WHEN SHE HAD SENT THEM ALL THE EVIDENCE THAT THE FATHER HAD STOLEN THE CHILDREN FROM HER IN 1988 . . . . **THEREFORE THE LOWER COURT'S RULING [the decision of the Clermont County Juvenile Court] MUST BE OVER TURNED AS STATED IN THE 14 AMENDMENT AND THIS COURT ORDER THE DEFENDANTS TO RETURN MRS[.] HOLLOWAYS [sic] CHILDREN TO HER AND TO ORDER THAT THE DEFENDANTS ALSO PAY RESATUTION [sic] TO MRS[.] HOLLOWAY FOR** VIOLATING HER CIVIL RIGHTS AND TO PAY THE AMOUNTS LISTED IN THE ORIGINAL COMPLAINT.

> * * *

> SO WE FEEL THAT THIS COURT DUE TO ALL THE EVIDENCE HAS NO CHOICE BUT TO DENIE [sic] THE DEFENDANTS [sic] DISMISSAL MOTION AND TO FIND IN MRS[.] HOLLOWAYS [sic] FAVOR **AND TO GRANT HER ALL RELIEF ASK [sic] FOR IN HER COMPLAINT AND TO ORDER THE DEFENDANTS TO RELEASE HER CHILDREN TO HER[.]**

(J.A. at 42-43 (emphasis added)). The express language of Plaintiff's responsive pleading clearly challenges the testimony presented at the hearings regarding Plaintiff's contention that she did not abandon her children, but that her husband absconded with them; requests the district court to

| Date | State Court | Date | Federal Court |
|------|-------------|------|---------------|
|  |  | 5/16/96 | District Court enters order granting Defendants' motion for summary judgment on the basis of absolute immunity. (J.A. at 18.) |
| 5/17/96 | Plaintiff files motion in CCJC seeking immediate reunification with her children. |  |  |
| 6/96 | Pretrial conference on Plaintiff's motion is held; CCJC denies Plaintiff's motion; CCDHS states its intention to serve Plaintiff with a new complaint seeking permanent custody. |  |  |
|  | On the same day, Plaintiff files a petition for a writ of habeas corpus in the Ohio Court of Appeals to restore custody. |  |  |
|  | Ohio Court of Appeals thereafter denies her petition, and Plaintiff appeals to the Ohio Supreme Court. |  |  |
|  |  | 6/17/96 | Plaintiff files notice of appeal at hand. |

| Date | State Court | Date | Federal Court |
|---|---|---|---|
| 10/22 /97 | Ohio Supreme Court affirmed the court of appeals denial of the writ, finding that Plaintiff had a legal remedy in the ordinary course of law by being served with a copy of the amended complaint for permanent custody. *See Holloway v. Clermont County Dep't of Human Servs.*, 684 N.E.2d 1217, 1219-20 (Ohio 1997). | | |
| | | 4/30/98 | Oral argument heard by original *Holloway* panel. |
| | | 6/30/99 | Sixth Circuit affirms the district court's order granting Defendants' summary judgment. *See Holloway v. Ohio*, 179 F.3d 431, *reh'g en banc granted, vacated by* 197 F.3d 236 (6th Cir. 1999). |
| 8/6/ 99 | Plaintiff files a new petition for writ of habeas corpus in the Ohio Supreme Court. | | |
| 8/18/ 99 | Clermont County Department of Human Services files a motion to dismiss the petition, arguing no new grounds had been alleged by Plaintiff. | | |

uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged. Extended uncertainty would be inevitable in many cases if federal courts had jurisdiction to relitigate state custody decisions.

*Id.* at 513-14 (footnote omitted). Defendants in this case argued that *Lehman* and the reasoning stated therein controlled because Plaintiff was actually seeking to challenge the substance of the custody hearing as well as the return of her children by way of her § 1983 claim. Clermont County also argued that the district court lacked jurisdiction under the *Rooker/Feldman* doctrine. *See* discussion *infra* Part II.C.2.

The district court rejected Defendants' contentions and held that the court had jurisdiction over Plaintiff's § 1983 claim. The court began by recognizing that federal courts traditionally have declined to accept jurisdiction over child custody disputes. However, the court went on to hold that because the underlying custody matter was not in question and Plaintiff's cause of action was cognizable in tort, the child custody exception to jurisdiction did not apply. The district court then qualified its holding as follows:

However, to the extent that plaintiff seeks an order from this court for the return of her children, this Court lacks jurisdiction to grant such relief. Such relief would require the Court to address the underlying merits of the action terminating plaintiff's parental rights. This is the province of the state courts, and any relief plaintiff seeks in this respect must be sought through the state courts.

(J.A. at 76 (citations and footnote omitted)).

One need look no further than Plaintiff's response to Defendants' motion to dismiss to see how the district court's decision to invoke jurisdiction contradicts its own written opinion. Specifically, in Plaintiff's response to Defendants' motion to dismiss, she not only questioned and challenged the underlying merits of the custody determination by claiming

Regarding the law of the case, the issue to be examined is whether the Ohio District Court should have dismissed the matter where the Kansas District Court previously had before it the same claims made by Plaintiff – her civil rights were violated, her children were taken from her without due process of law, and her children should be immediately returned to her – and the Kansas District Court ruled as matter of law that it lacked subject matter jurisdiction over Plaintiff's claims. Any affirmative defense asserted after the Ohio District Court allowed the case to proceed has nothing to do with whether the Ohio District Court was bound by the Kansas District Court's ruling at the outset of the case. *See Hayman Cash Register Co.,* 669 F.2d at 166-69. Thus, the Ohio District Court should have recognized the law of the case doctrine when Defendants brought their motion to dismiss for lack of subject matter jurisdiction.

## C. Defendants' Motion to Dismiss and the District Court's Erroneous Conclusion that the Court had Subject Matter Jurisdiction Over the Case

Defendants filed a motion to dismiss Plaintiff's claim on the basis of, among other things, lack of subject matter jurisdiction under *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502 (1982). In *Lehman,* the Supreme Court held that 28 U.S.C. § 2254 does not confer federal court jurisdiction to consider collateral challenges to state court judgments involuntarily terminating parental rights. *Id.* at 516. In reaching this decision, the Court found that the need for finality of judgments was in the best interests of the children:

> The State's interest in finality is unusually strong in child-custody disputes. The grant of federal habeas would prolong uncertainty for children such as the Lehman sons, possibly lessening their chances of adoption. It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as

| Date | State Court | Date | Federal Court |
|---|---|---|---|
| 9/22/99 | Ohio Supreme Court unanimously denies Plaintiff's petition for writ of habeas corpus; sustains Defendant's motion; and dismisses the action. *See Holloway v. Clermont County Dep't of Human Servs.,* 716 N.E.2d 720 (Ohio 1999) (table decision) | | |
| | | 12/8/99 | Case reheard by *en banc* court. Plaintiff avers through counsel that the CCDHS had recently notified and served her with a dependency hearing complaint. |

The fact that Plaintiff sought relief from this Court while custody matters were on going in the Ohio state courts, along with the fact that Plaintiff requested the district court to order Defendants to return her children to her, are significant in understanding why this Court lacks subject matter jurisdiction. However, as explained in the following section, this case should have been dismissed by the Ohio District Court under the law of the case doctrine, where the United States District Court for the District of Kansas had previously dismissed the same claims by which Plaintiff sought the same relief.

## B. The Law of the Case Doctrine As Applied to Plaintiff's Claim Filed in the United States District Court for the Southern District of Ohio

"'As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (alteration

omitted) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *see United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). "[T]he doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson*, 486 U.S. at 816 (examining claim that one circuit court was bound by a different circuit court's decision under law of the case). In fact, "[f]ederal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts." *Id.* As the Supreme Court has found, "the policies supporting the doctrine apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation." *Id.* Indeed, the basic premise behind the law of the case doctrine is that courts should generally "refuse to reopen what has been decided." *Messinger v. Anderson*, 225 U.S. 436, 444 (1912).

However, the law of the case doctrine is not an "inexorable command." *See United States Steel Corp. v. Holley,* 479 F.2d 489, 494 (6th Cir. 1973). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (quoting *Arizona v. California,* 460 U.S. at 618 n.8). We have held that a court must "find some cogent reason to show the prior ruling is no longer applicable" before refusing to apply the law of the case. *See Holley*, 479 F.2d at 494. Factors to consider in determining whether a prior ruling may be ignored include "substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest injustice." *See id.* (citing *White v. Martha*, 377 F.2d 428, 431-32 (5th Cir. 1968)). With that said, however, revisions in the law of the case occur "very infrequently" when one court is asked to review the decision of a coordinate court. *See Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 900 (Fed. Cir. 1984).

because the court properly found that it lacked subject matter jurisdiction to hear the matter. Simply put, in an effort to find that the law of the case doctrine does not apply, the majority makes misstatements and attempts to characterize Plaintiff's case as one about an affirmative defense, as opposed to focusing on the nature of Plaintiff's claims.

In another effort to find that the law of the case doctrine does not apply, the majority attempts to divorce the two Kansas decisions, and confuses principles attendant to *res judicata* – issue preclusion and claim preclusion – with the law of the case doctrine. However, despite its efforts, the majority's attempts simply do not carry the day. First, a review of the Kansas District Court's October 13, 1993 opinion indicates that District Judge Crow clearly considered the fact that Plaintiff brought civil rights claims -- the same civil rights claims that she brought in the Ohio District Court; therefore, contrary to the majority's position, the Kansas District Court *did* consider Plaintiff's claims as an amendment to her original pleading. Under Fed. R. Civ. P. 15(c), the amendment relates back to the same conduct, transaction and occurrence as Plaintiff's original complaint, and the two pleadings should thus be considered as one.

Moreover, as noted in Wright and Miller under the "Law of the Case," "[d]ismissal for want of jurisdiction precludes relitigation of the same jurisdiction issue." *See* 18 C. Wright, A. Miller &E. Cooper, Federal Practice and Procedure § 4436 (2000 Supp.). The Ohio District Court was therefore precluded from relitigating the issue, and erred when it denied Defendants' motion to dismiss for lack of subject matter jurisdiction. The majority cannot escape this fact by arguing that principles of *res judicata* apply to bar the law of the case. The majority incorrectly applies principles of *res judicata* to the law of the case doctrine. It is without question that a decision on the merits is required in order for *res judicata* to apply, *see supra* note 2; however, contrary to the majority's unsupported claim, a decision on the merits *is not* necessary for the law of the case to apply. *See Christianson*, 486 U.S. at 816.

pursuant to the Kansas decisions. *See Skil Corp. v. Millers Falls Co.*, 541 F.2d 554, 557 (6th Cir. 1976) ("We should never assume that a court of concurrent jurisdiction neglected to perform its duty, particularly when its order clearly shows full performance."). This is particularly so where in her response to Defendants' motion to dismiss filed in the court below, Plaintiff *twice* requested that the district court order Defendants to return her children to her, (J.A. at 41-43), and Plaintiff did not seek relief in state court until it became apparent that the State of Ohio and Ohio Department of Human Services were going to be dismissed as parties from the federal suit.

In an attempt to distinguish the law of the case doctrine and find it to be inapplicable here, the majority makes statements which are simply false and mischaracterizes the matter. For example, the majority asserts that the Kansas District Court "never even mentioned damages (which Holloway was not seeking in that action)." However, in ruling on what it termed to be Plaintiff's Rule 60(b) motion, the Kansas District Court expressly stated that "In addition to the return of her children, . . . Holloway also seeks compensation in the amount of $2,000,000.00 for the pain and suffering caused by the termination of her parental rights. Holloway alleges that the termination of her parental rights violated the Sixth, Eighth and Fourteenth Amendments, as well as certain statutes. Holloway also alleges violation of her civil rights." *See Holloway v. State of Ohio*, 1993 WL 463426, at *1 (D. Kan. Oct. 18, 1993).

Likewise, the majority asserts that the Kansas District Court "never even mentioned . . . Sally Brush." However, one need look no further than the captions of each of the decisions from the Kansas District Court regarding Plaintiff's claims to see Sally Brush expressly named as a defendant. *See Holloway,* 1993 WL 463426; *Holloway,* 1993 WL 302240. In addition, the majority makes a great deal of the fact that the Kansas district court did not address the affirmative defense of § 1983 immunity. However, it was not necessary for the Kansas District Court to address or consider the affirmative defense

Although the case at hand is not a "transfer" case in the typical sense of the term, it is nonetheless a case which was decided by a previous coordinate court on a rule of law – subject matter jurisdiction – which the Ohio District Court should have respected and used as a basis to dismiss the case. In other words, the district court should have dismissed Plaintiff's case under the law of the case doctrine based upon the rulings from the Kansas District Court.[2] *See Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 166-69 (3d Cir. 1982) (holding that law of the case prevented the New Jersey District Court from redetermining jurisdictional issue previously decided by the District of Columbia District Court, and noting that "the principles of comity among courts of the same level of the federal system provide further reason why . . . an issue already decided by a court of equal authority" should not be reexamined); *see also Holloway v. State of Ohio*, No. 93-4139-SAC, 1993 WL 463426, at **1-**2 (D. Kan. Oct. 18, 1993); *Holloway v. State of Ohio*, No. 93-4139-SAC, 1993 WL 302240 (D. Kan. July 27, 1993).

Indeed, an examination of Plaintiff's complaint filed in the United States District Court in Kansas, as well as an examination of her "Motion: For this courtto [sic] order fair hearing an [sic] suit for civil rights violations" filed in that court, as compared to her complaints filed in the Ohio District

---

[2] Of course, a district court's decision to adhere to or to deviate from the law of the case cannot bind an appellate court's review of the matter. *See Messinger v. Anderson*, 225 U.S. 436, 444 (1912). Furthermore, the doctrine of *res judicata* would not apply in this instance because a dismissal rendered on the basis of lack of subject matter jurisdiction does not operate as a dismissal on the merits for purposes of *res judicata*, except where a statutory right is being pursued and the plaintiff or the defendant does not come within the purview of the statute. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 917 (6th Cir. 1986). Here, Defendants Clermont County and Sally Brush fall within the purview of § 1983. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). Likewise, a dismissal under 28 U.S.C. § 1915(d), the alternative basis upon which the Kansas court dismissed Plaintiff's claim, is not a decision on the merits for purposes of *res judicata*. *See Denton v. Hernandez*, 504 U.S. 25, 34 (1992).

Court, clearly indicate that Plaintiff was filing the same claim and seeking the return of her children from the district court below, just as she sought from the district court in Kansas.[3] For example, in her complaint to the Kansas District Court, Plaintiff stated as follows:

> We feel that this case falls under this courts [sic] jurisdiction as it is a flagrant violion [sic] of her and her childrens [sic] rights to know and to love each other and their right to life, lib. and pre suit [sic] of happyness [sic]. As how can she or her children be happy not being togather. [sic]

> We pray that this court will find it in their hearts and law to reunite these children with their natural birth mother.

Complaint of Sammye R. Holloway at 2, *Holloway*, 1993 WL 302240 (D. Kan. July 27, 1993). Once again, in a subsequent pleading which the Kansas District Court interpreted as a Rule 60(b) motion, Plaintiff stated and prayed as follows:

> WE FEEL THAT THIS COURT DOES HAVE JURISDICTION, BECAUSE OF THE VILOATIONS [sic] OF MRS. HOLLOWAYS [sic] SIXTH, EIGHTTH [sic], AND FOURTEENTH CIVIL RIGHTS. . . . SO WE NOW COME TO THIS COURT PRAYING FOR RELIEF, IN THAT WE WANT THIS COURT TO

---

[3] Although the pleadings from the Kansas District Court were not provided in the Joint Appendix submitted in connection with this appeal, we may take judicial notice of proceedings in other courts of record, and I have done so here by obtaining the pleadings cited above from the Kansas District Court. *See Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) (citing *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969) (collecting cases)). Plaintiff named the State of Ohio and Sally Brush as defendants in the complaint filed in Kansas; she added Clermont County and the Ohio Department of Social Services to the complaint filed in Ohio. However, the addition of the two named defendants did nothing to change the fact that the federal court lacked subject matter jurisdiction over the case.

> HOLD A FAIR HEARING IN TO WAY [sic] MRS. HOLLOWAYS [sic] CHILDREN SHOULD NOT BE RETURNED TO HER AND ALSO ASK THIS COURT FOR COMPENSATION FOR THE PAIN AND SUFFERING THEY ARE CONTINUAING [sic] TO CAUSE MRS. HOLLOWAY AND FOR THE VILOATIONS [sic] TO HER CIVIL RIGHTS IN THE AMOUNT OF TWO MILLION DOLLARS[.]

"Motion: for this Court to Order Fair Hearing an [sic] Suit for Civil Rights Violations" at 1-2, *Holloway*, 1993 WL 463426, at **1-**2 (D. Kan. Oct. 18, 1993) (emphasis in original). Likewise, in her complaint to the Ohio District Court, Plaintiff claimed a violation of her right to due process under the Fourteenth Amendment because she had been deprived of the right to life, liberty and the pursuit of happiness, and that Defendants were working together to keep her and her sons apart, based upon the same allegations made in the Kansas complaint where Plaintiff prayed for in excess of two million dollars. (J.A. at 8-9.) Thus, because Plaintiff sought the same claims and the same relief in the Ohio District Court that she sought from the Kansas District Court, the Ohio District Court should have bowed to the decision of its coordinate court under the law of the case, and refused to reexamine Plaintiff's claim absent "extraordinary circumstances." *See Christianson*, 486 U.S. at 817; *Hayman Cash Register Co.*, 669 F.2d at 166-69.

No such extraordinary circumstances exist in this case. In fact, as will be shown in the section that follows, the Kansas District Court reached the only possible result allowed under prevailing Supreme Court precedent, where Plaintiff's § 1983 due process claim was filed in an effort to gain custody of her children and to challenge the merits of the underlying state custody determination. *See* discussion *infra* Part II.C.; *see also Holloway*, 1993 WL 302240, at **1 (citing *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502 (1982)). Therefore, the district court should have dismissed Plaintiff's case, if not on its own accord, then by way of Defendants' motion to dismiss, under the law of the case